[No. B017138. Second Dist., Div. Five. Dec. 10, 1987.]

DANIEL DiROSARIO et al., Plaintiffs and Respondents, v. GARY JORDAN HAVENS, Defendant and Appellant.

**COUNSEL**

Horvitz, Levy & Amerian, Patrick Hast, Barry R. Levy, David M. Axelrad and Grant Marylander for Defendant and Appellant.

Greene, O'Reilly, Broillet, Paul, Simon, McMillan, Wheeler & Rosenberg, Michael L. Goldberg, Browne Greene and Jean T. Pellagatti for Plaintiffs and Respondents.

---

**OPINION**

**NEBRON, J.*—**This is an appeal from a judgment in favor of plaintiffs Daniel L. and Rachel DiRosario (hereafter respondents), and against defendant Dr. Gary Havens (hereafter appellant or Dr. Havens).

This case arises out of an action brought by the surviving parents for the wrongful death of their minor daughter, Debbie Lisa DiRosario, who as a pedestrian crossing in an intersection, was struck and killed by an automobile driven by appellant Dr. Havens.

The jury's verdict for respondents was unanimous. By special finding, the jury awarded damages to Daniel L. DiRosario in the amount $859,500, and to Rachel DiRosario in the amount of $1,224,800; the jury further found that Debbie DiRosario was 40 percent at fault and Dr. Havens 60 percent at fault.[1] Appellant's motion for a new trial was denied.

### FACTS OF THE CASE

On the afternoon of October 31, 1979, Debbie DiRosario was crossing Beverly Boulevard at its intersection with June Street in the City of Los Angeles. She was struck by a 1972 Mercedes-Benz 450SL automobile, driven by appellant who was proceeding westbound on Beverly Boulevard.

At trial appellant acknowledged that he was the driver of the automobile, that he was familiar with that intersection; and that he was aware that there was a school in the vicinity. Appellant testified that the day was clear and sunny; that there was no traffic obstructing his visibility of the intersection at Beverly Boulevard and June Street as he approached from the east. He acknowledged that he could see the traffic signals controlling the June/Beverly intersection as he approached from at least 800-1,000 feet away. He stated that he did not see Debbie crossing the street.

Two percipient witnesses were called to testify. One witness, Charlene Nowak, was in a car on June Street at the corner of Beverly Boulevard

---

* Assigned by the Chairperson of the Judicial Council.

[1] The jury also found for the City of Los Angeles and against the respondents. No appeal has been taken from the judgment entered in favor of the City of Los Angeles.

facing north, waiting for the light to change so that she could proceed. Nowak was familiar with the intersection. She approached the intersection at about the same time as Debbie. The light had changed to red for June Street traffic just as Nowak and Debbie had approached the intersection. Nowak noticed Debbie because of her "bright red sweater." Debbie kept pushing the button that controlled the pedestrian "walk/don't walk" signal. Nowak estimated that this continued for about a minute and a half. The pedestrian signal never turned to "walk" for Debbie. Finally, Debbie stepped off the curb and darted across Beverly Boulevard. She had cleared the middle of the boulevard and had almost gained the other curb when she was struck by the Mercedes.

Nowak testified that she did not see the Mercedes until it was in the intersection. She did not hear the sounding of a horn or the screeching of brakes. The speed limit in the area was 35 miles per hour. Nowak estimated that the Mercedes was going about 40 miles per hour and was accelerating at the time of the impact.

Nowak further testified that upon impact Debbie's body was thrown into the air; books, shoes and papers went flying.

Rita Shamie was also on June Street at the Beverly Boulevard intersection, driving southbound and waiting for the light to change. She saw Debbie running in the crosswalk and noted that she had almost reached the northern curb when she was hit. Shamie first saw the Mercedes after impact and estimated that at that time the car was traveling in excess of 35 miles per hour.

Respondents' reconstruction expert, Harry Krueper, calculated the estimated speed of the Mercedes at the point of impact with Debbie at between 42 and 48 miles per hour.[2] His conclusions were that Dr. Havens had been driving in an inattentive manner; he further testified that he could see no reason why Dr. Havens had not seen the child.

The officers investigating the accident concluded the primary collision factor was Debbie's running into the crosswalk against the red light. Further, the officers concluded the inattention of both Debbie and Dr. Havens was an associated factor.[3]

Dr. Havens testified that he had just heard a traffic-safety program which had stressed that the primary danger when approaching an intersection was

---

[2] Krueper's testimony will be discussed in greater length later in this opinion.
[3] In total, 18 witnesses testified over a period of approximately 8 days of testimony.

from cars entering the intersection from the driver's left, and so he was checking for cars coming from the left on June Street as he approached that intersection. Despite specifically looking to the left as he approached the June Street intersection, he did not see the Nowak car which was to his left waiting for the light to turn or the decedent who was standing just beyond the Nowak car on the southwest corner of the intersection.

## ISSUES OF THE CASE

1. Did the trial court commit prejudicial error by permitting plaintiffs to show a videotape recreating the accident?

2. Does the conduct of the jurors during their deliberations require reversal of the judgment?

3. Was the damage award so excessive that it should be reversed as a matter of law?

4. Should this court substantially reduce the jury award?

## DISCUSSION

### DID THE TRIAL COURT COMMIT PREJUDICIAL ERROR BY PERMITTING PLAINTIFFS TO SHOW A VIDEOTAPE RECREATING THE ACCIDENT? NO.

Respondents' expert, Harry Krueper, reconstructed the accident based on eyewitness statements, the police reports and his visits to the scene of the accident. Krueper had surveyed the scene of the accident and a videotape was shown to the jury in which a woman, about five feet tall and wearing a red jacket, walked across the same crosswalk while a Mercedes-Benz automobile, similar to Havens's car approached the same intersection on Beverly Boulevard from the east. Lighting conditions were the same as those on the day of the accident. The camera was put in the vehicle directly beside the driver's eye. Krueper had surveyed the distances from the intersection and marked them at 200-foot intervals. The traffic light controlling the Beverly/June intersection was clearly visible beyond 1,000 feet away.

Counsel and the trial court viewed the videotape out of the presence of the jury. Appellant's objection to the videotape admission into evidence was based upon the following disparities:

1. The accident occurred October 31, 1979, while the videotape was made in June 1980. Therefore, the sun's position on the horizon was different on the day of the accident than on the day of the videotape.

2. The videotape depicted a five-foot woman crossing the street, while the evidence showed that Debbie was four feet tall.

3. The traffic, the day of the accident, was light, whereas the videotape showed traffic as heavy.

4. The lane markings depicted in the videotape were different from those existing the day of the accident.

5. The camera was fixed toward the intersection. But the human eye does not view things in the same manner as a fixed camera. Therefore, the videotape did not accurately depict what Havens could have or should have seen.

6. Because the jury already knew that Debbie was wearing red, they were primed to look for someone in red crossing the street. Havens did not have the luxury of 20/20 hindsight when the accident occurred. Therefore, the jury would be viewing the videotape not as a driver but as a spectator who knows what is about to occur.

 "Admissibility of experimental evidence depends upon proof of the following foundational items: (1) The experiment must be relevent (Evid. Code, §§ 210, 351); (2) the experiment must have been conducted under substantially similar conditions as those of the actual occurrence (*Andrews v. Barker Brothers Corp.* [1968] 267 Cal.App.2d 530, 537 [73 Cal.Rptr. 284]); and (3) the evidence of the experiment will not consume undue time, confuse the issues or mislead the jury (*Schauf v. Southern Cal. Edison Co.* [1966] 243 Cal.App.2d 450, 455 [52 Cal.Rptr. 518]).

 "In the case of experimental evidence, the preliminary fact . . . necessary to support its relevancy is that the experiment was conducted under the same or similar conditions as those existing when the accident took place. The standard that must be met in determining whether the proponent of the experiment has met the burden of proof of establishing the preliminary fact essential to the admissibility of the experimental evidence is whether the conditions were substantially identical, not absolutely identical. (*Beresford v. Pacific Gas & Elec. Co.* [1955] 45 Cal.2d 738, 749 [290 P.2d 498, 54 A.L.R.2d 910]." (*Culpepper v. Volkswagen of American, Inc.* (1973) 33 Cal.App.3d 510, 521 [109 Cal.Rptr. 110]; see also *People v. Roehler* (1985) 167 Cal.App.3d 353, 387 [213 Cal.Rptr. 353].)[4]

---

[4] Appellant places great emphasis on dicta in *Harmon v. San Joaquin L. & P. Corp.* (1940) 37 Cal.App.2d 169, 174 [98 P.2d 1064]: "Moving pictures should be received as evidence with caution, because the modern art of photography and the devices of an ingenious director

 In this case, the trial judge ruled that the conditions on the tape were substantially similar; that the tape was not unduly time consuming and would aid the jury. That discretion was exercised after consideration of defendant's opposition to its admission, and extensive voir dire questioning of witness Krueper. "The admission of such evidence is largely a matter of discretion with the trial court, and such a test is merely a circumstance to be considered in connection with other evidence in the case." (*Ortega* v. *Pacific Greyhound Lines, Inc.* (1937) 20 Cal.App.2d 596, 597-598 [67 P.2d 702].)

 Appellant's argument that the conditions were sufficiently dissimilar so as to make the videotape misleading is not persuasive. Appellant fails to demonstate how these differences could have made the videotape misleading as to the purposes for which it was offered. For example, the difference in road markings had no effect on the visibility of the traffic signals at that intersection. Moreover, heavier traffic on the day of videotaping would favor the defendant. The sun's different position on the horizon is inconsequential since Krueper calculated that on the day of the accident the sun was above the angle of the roof of the Mercedes, as it was on the day of the videotaping. As to the fixed direction of the camera versus the constant movement of the eyes of Dr. Havens, the jury could reasonably have inferred that at some point before Dr. Havens reached the intersection, his eyes could have looked straight ahead, down the road on which he was traveling and toward the intersection which he was approaching.

On the other hand, respondents demonstrated that the conditions of the videotape were substantially identical to those encountered by the appellant. The videotape showed an approach to the identical intersection from the same direction that Dr. Havens's approached. The same model car was used. The lighting conditions were the same. The person in the crosswalk was wearing red, as was Debbie. In every respect pertinent to visibility of the intersection and of anyone within it from an approaching automobile, the conditions of the videotaping were virtually identical to those experienced by defendant.

 "In ruling upon the admissibility of photographs, the trial judge has two primary duties; one, to determine whether the photograph is a reasonable representation of that which it is alleged to portray and, second, whether the use of the photograph would aid the jurors in their determination of the facts of the case or serve to mislead them. Within these limits, there is ample authority holding that the physical conditions which existed at the

frequently produce results which may be quite deceiving [citation]." However, in that case the film was received in evidence and the judgment was affirmed.

time the event in question occurred need not be duplicated with precision nor is it required that no change has occurred between the happening of the event and the time the photograph is taken. (18 Cal.Jur.2d, § 227, p. 708, and authorities cited therein.)" (*Anello* v. *Southern Pacific Co.* (1959) 174 Cal.App.2d 317, 323 [344 P.2d 843]; see also *Hayes* v. *Emerson* (1930) 110 Cal.App. 470 [294 P. 765].)[5]

■■■ But, assuming that it was error for the trial judge to admit the videotape, the error was harmless as the tape afforded visual confirmation of what the other witnesses had testified. (*Hayes* v. *Emerson, supra,* 110 Cal.App. 470, 474; see also *Ortega* v. *Pacific Greyhound Lines, Inc., supra,* 20 Cal.App.2d at pp. 597-598.)

## DOES THE CONDUCT OF THE JURORS DURING THEIR DELIBERATIONS REQUIRE REVERSAL OF THE JUDGMENT? NO.

1. Did the jury disregard the trial court's admonition not to apply BAJI No. 3.38 to defendant?[6]

The jury were given a modified BAJI No. 3.38[7] which read as follows: *"This instruction does not apply to Deft [sic] Havens*

"Ordinarily it is necessary to exercise greater caution for the protection and safety of a young child than for an adult person who possesses normal physical and mental faculties. One dealing with children must anticipate the ordinary behavior of children. The fact that they usually do not exercise the same degree of prudence for their own safety as adults, that they often are thoughtless and impulsive, imposes a duty to exercise a proportional vigilance and caution on those dealing with children, and from whose conduct injury to a child might result.

---

[5]*Anello,* relied upon by appellant, is an example of a case where the court in dicta disapproved the use of the photographs in question, but declined to decide whether the introduction of the photographs "standing alone" constituted reversible error, since the judgment was reversed because an erroneous instruction was given which required reversal. (174 Cal.App.2d 317, at pp. 323-324.)

[6]BAJI No. 3.38 states: "Ordinarily it is necessary to exercise greater caution for the protection and safety of a young child than for an adult person who possesses normal physical and mental faculties. One dealing with children must anticipate the ordinary behavior of children. The fact that they usually do not exercise the same degree of prudence for their own safety as adults, that they often are thoughtless and impulsive, imposes a duty to exercise a proportional vigilance and caution on those dealing with children, and from whose conduct injury to a child might result."

[7]The modified instruction was delivered orally by the judge. Further, the instruction was sent into the jury room.

*"This instruction does not apply to defendant Havens* [Initialed by] RBL/??"[8] (Italics added.)

██ Appellant contends that the jury ignored the court's instruction and, in fact, actually applied BAJI No. 3.38 to Dr. Havens and that because of the misapplication of the instruction, the jury assigned a greater percentage of negligence to Dr. Havens than it would otherwise have done.

Affidavits of six jurors[9] were submitted to the trial court for its consideration at the time of appellant's motion for new trial. All six affidavits contained the language of BAJI No. 3.38, but none of them referred to the amended language of the instruction which was actually given both orally and in writing by the trial court. No counter affidavits were submitted by respondents.

At the hearing on the motion for new trial, respondents requested that the jurors' affidavits be stricken. The trial court denied the motion for a new trial, we do not have the benefit of the judge's reasoning.[10]

Evidence Code section 1150, subdivision (a) states: "Upon an inquiry as to the validity of a verdict, any otherwise admissible evidence may be received as to statements made, or conduct, conditions, or events occurring, either within or without the jury room, of such a character as is likely to have influenced the verdict improperly. No evidence is admissible to show the effect of such statement, conduct, condition, or event upon a juror either in influencing him to assent to or dissent from the verdict or concerning the mental processes by which it was determined."

██ In *People v. Hutchinson* (1969) 71 Cal.2d 342, 349 [78 Cal.Rptr. 196, 455 P.2d 132], the court explained that Evidence Code section 1150 properly distinguishes between "proof of overt acts, objectively ascertainable, and proof of the subjective reasoning processes of the individual juror, which can be neither corroborated nor disproved, . . ." (*Id.* at p. 349.) In *Hutchinson* the court approved the admission of jurors' affidavits, for the

---

[8] The reason that the duplicated handwritten portion appeared at both the top and bottom of the instruction is that appellant's counsel on the second day of jury deliberations observed that the instructions were put together with Acco fasteners and that the handwritten instruction by the court was obscured by the fasteners. Upon request made to the court, the limiting phrase was also written in at the bottom of the instruction. We do not know if the instructions were taken apart in the jury room.

We assume that the initials RBL stand for the name of the trial judge, Robert B. Lopez. We cannot ascertain the letters after the slash mark and thus have used question marks.

[9] Foreman Kramer, Gray, Nakata, Crowe, Wicker, and Cichon.

[10] The trial court assured counsel that he would review the documentation and the pleadings filed both in support of and in opposition to the motion before issuing his ruling.

purposes defined and limited by Evidence Code section 1150, adding, however, that "[t]he only improper influences that may be proved under section 1150 to impeach a verdict, therefore, are those open to sight, hearing, and the other senses and thus subject to corroboration [citation omitted]." (*Id.* at p. 350.)

If the jurors in this case made their decision based upon an intentional collective disregard of BAJI No. 3.38, as actually given by the judge, then such activity would be grounds for seriously considering reversal of the judgment.

Under Evidence Code section 1150, and cases interpreting that section, jurors are only competent witnesses to prove objective facts to impeach a verdict. Thus, in *People* v. *Hutchinson, supra,* 71 Cal.2d 342 the objective fact was the intrusion of the bailiff into jury deliberations. (For other situations see *People* v. *Valles* (1979) 24 Cal.3d 121 [154 Cal.Rptr. 543, 593 P.2d 240, 15 A.L.R.4th 1116], *People* v. *Honeycutt* (1977) 20 Cal.3d 150 [141 Cal.Rptr. 698, 570 P.2d 1050]; *Hasson* v. *Ford Motor Co.* (1982) 32 Cal.3d 388 [185 Cal.Rptr. 654, 650 P.2d 1171]; *Andrews* v. *County of Orange* (1982) 130 Cal.App.3d 944 [182 Cal.Rptr. 176]; *Clemens* v. *Regents of University of California* (1971) 20 Cal.App.3d 356 [97 Cal.Rptr. 589].)

■ We perceive certain problems with appellant's reasoning. First, the jury instruction used by appellant in support of each affidavit was not the jury instruction given by the trial judge. Second, the six affidavits clearly delved into the subjective concerns of jurors during their deliberations and are not objectively verifiable. Third, the affidavits do not support the contention that the jury collectively and intentionally disregarded the instruction *as given.* (As to the latter point, cf. *People* v. *Elkins* (1981) 123 Cal.App.3d 632, 638 [176 Cal.Rptr. 729]; *United States* v. *Stacey* (9th Cir. 1973) 475 F.2d 1119, 1121.)

As to this issue, the trial court properly denied the motion for new trial.

2. Does the conduct of the jury foreman require reversal of the judgment?

■ Appellant contends that the jurors' affidavits established that the jury foreman committed serious misconduct by making statements advising the jury not to worry about the size of the verdict they might return because the trial court had the power to reduce any excessive award.

The foreman's conduct, appellant contends, impeaches the verdict since it discloses the objectively verifiable fact that a statement was made by a juror

concerning principles of law which should not have been considered by the jury.

To support its position, appellant places heavy reliance on Justice Stanley Mosk's language in the criminal case of *In re Stankewitz* (1985) 40 Cal.3d 391 [220 Cal.Rptr. 382, 708 P.2d 1260]. In that case petitioner sought a writ of habeas corpus after he was convicted of first degree murder and robbery and sentenced to death. He contended that he was denied a fair trial because one of the jurors introduced *erroneous* law on a crucial issue into the guilt phase deliberations. Two jurors' declarations stated: ". . . in substance as follows: on several occasions during the guilt phase deliberations Juror Louis Knapp advised the other jurors that he had been a police officer for over 20 years; that as a police officer he knew the law; that the law provides a robbery takes place as soon as a person forcibly takes personal property from another person, whether or not he intends to keep it; and that as soon as petitioner took the wallets at gunpoint in this case he committed robbery, whether or not he intended to keep them.

". . . . . . . . . . . . . . . . . .

"When extraneous law enters a jury room—i.e., a statement of law not given to the jury in the instructions of the court—the defendant is denied his constitutional right to a fair trial unless the People can prove that no actual prejudice resulted. [Citations omitted.]" (40 Cal.3d 391 at pp. 396-397.)

"Here Knapp likewise violated the court's instructions and 'consulted' his own outside experience as a police officer on a question of law. Worse, the legal advice he gave himself was totally wrong. Had he merely kept his erroneous advice to himself, his conduct might be the type of subjective reasoning that is immaterial for purposes of impeaching a verdict. But he did not keep his erroneous advice to himself; rather, vouching for its correctness on the strength of his long service as a police officer, he stated it again and again to his fellow jurors and thus committed overt misconduct." (40 Cal.3d at pp. 399-400.)

And in a footnote to the preceding quotation, Justice Mosk goes on to say: "Our conclusion that Knapp's statement constitutes serious misconduct per se does not implicate the reasoning processes of the jurors any more than a holding that a trial court gave an erroneous instruction implicates the reasoning processes of the judge or jury." (*Id.* at p. 400.)

". . . the fact remains that in erroneously stating the law [Knapp] vouched for its correctness on the strength of his long service as a police officer.

"The misconduct of Juror Knapp raises a presumption of prejudice. [Citations omitted.] Such a presumption is even stronger when, as here, the misconduct goes to a key issue in the case: the resolution of the question whether a robbery took place was critical to the prosecution's felony-murder theory, to the separate robbery count, and to the robbery special-circumstance allegation. [Citation omitted.]" (*Id.* at p. 402.)

But in *Ballard* v. *Uribe* (1986) 41 Cal.3d 564 [224 Cal.Rptr. 664, 715 P.2d 624] Justice Mosk, in a concurring opinion,[11] stated as follows: "I must express my apprehension at an incipient trend, that of losing parties attempting to impeach jury verdicts. We see this in numerous appeals and petitions for review based on juror affidavits. Giving such appeals and petitions any credence prevents the finality of judgments, places additional burdens on the judicial process, and contributes to disenchantment with the tort system.

"Most juror affidavits, demonstrably so in this case, delve into the subjective concerns of the jurors during their deliberations. When deference is given to such affidavits, encouragement is given to opposing counsel in future cases to engage in postverdict competition to obtain juror affidavits revealing discussions that took place behind the closed doors of the deliberation room. Generally the party with the most resources will win that contest. If affidavits purportedly relating jury discussions are permissible, in the interest of accuracy we may as well install recording devices in jury rooms. [Fn. omitted.]

". . . . . . . . . . . . . . . . . . .

"*In re Stankewitz* [, *supra*,] 40 Cal.3d 391, is consistent with my views. Instruction on the law by the offending juror in that case amounted to an overt usurpation of the function of the court, and plainly constituted 'as much an objective fact as a juror's reading of a novel during the taking of testimony [citation], or a juror's consultation with an outside attorney for advice on the law applicable to the case [citation]." (*Id.* at pp. 575-576.)

It is apparent from reading the declarations[12] that there was discussion by the foreman and his fellow jurors of an award being reduced by the judge, if

---

[11] The concurrence was joined by Justice Lucas who again expressed his dissent from the reasoning in *Stankewitz*.

[12] The affidavit of Foreman Kramer states: ". . . we discussed the fact that if we had overstepped our bounds and voted to award too much money, we did not have to worry about it, because the Judge had the power to reduce the amount that we had decided to award."

Juror Gray's affidavit states: ". . . jury foreman, Mr. Kramer, informed the jury that if the award on which they had agreed was too high, he would ask the judge if he, the judge, could

excessive. These are overt acts that are admissible and to which jurors are competent to testify. But there is a conflict in the affidavits as to the exact role the foreman played in these discussions and also as to what he said. This is not like *Stankewitz* where instruction on the law by the offending juror amounted to an overt usurpation of the function of the court. The trial court's denial of the new trial motion amounted to a determination of the controverted facts in favor of the prevailing party and a rebuttal of the presumption of prejudice that might arise. (Cf. *Young* v. *Brunicardi* (1986) 187 Cal.App.3d 1344, 1350-1351 [232 Cal.Rptr. 588], where the affidavits and declarations before the trial court were not in conflict.) Further, in *Stankewitz* and *Brunicardi,* the jury was *erroneously* instructed by a fellow juror on a question of law. That was not the situation in this case.

As to this issue, we conclude that the trial court committed no error in denying the motion for a new trial.

### WAS THE DAMAGE AWARD SO EXCESSIVE THAT IT SHOULD BE REVERSED AS A MATTER OF LAW? NO.

1. Did respondents fail to sustain their burden of proving that the damages they suffered as a result of Debbie's death exceeded the anticipated cost of her education and support?

Appellant argues that damages for the loss of society, comfort and protection must be offset by the savings which the parents of decedent will enjoy as a result of not having to support and educate the child. Appellant argues that since respondents failed to present evidence of the amount of the savings, they did not sustain their burden as to an essential element of the damages, and that therefore the evidence was insufficient, as a matter of law, to support the jury's award of damages.

Appellant argues that the issue involves a question of public importance concerning the burden of proof in wrongful death cases and therefore may

---

lower the amount that they had agreed upon. I do not recall what the judge's response was to Mr. Kramer's question."

Juror Nakata's affidavit states: ". . . the jury foreman advised 'well, if we make a mistake and make the award too high, we don't have to worry about it, because the judge has the power to lower the amount awarded.' "

Juror Crowe's affidavit states: ". . . the jury foreman remarked that the judge was authorized to reduce the amount of any award, if he felt that the award was too high."

Juror Wicker's affidavit states: ". . . I recall the foreman made a comment that the Judge may have the authority to review or reconsider any award voted upon by the jury. However, he stated he was not positive that the judge had this authority."

Juror Cichon's declaration states: ". . . the jury foreman, Mark Kramer, informed the jury that we need not concern ourselves with the award being too high, since if we made a mistake and made the award too high, the judge had the power to lower that amount."

be considered by this court even though raised for the first time on appeal. To bolster his position, appellant cites *Fisher* v. *City of Berkeley* (1984) 37 Cal.3d 644, 654, footnote 3 [209 Cal.Rptr. 682, 693 P.2d 261], and *Tyre* v. *Aetna Life Ins. Co.* (1960) 54 Cal.2d 399, 405 [6 Cal.Rptr. 13, 353 P.2d 725]. Neither case is in point.

In this case, respondents were never given an opportunity to litigate this issue, which does raise factual questions, at the trial level. Given the totality of the circumstances in this case, we do not believe it is fair or reasonable to permit the appellant to raise this issue at this time. (See 9 Witkin, Cal. Procedure (3d ed. 1985) § 311, p. 321.)

2. Was the verdict so grossly excessive and out of all proportion to the evidence of loss in this case as to require reversal?

"The statutory cause of action for wrongful death, created in California in 1862, provided that 'pecuniary or exemplary' damages were to be awarded by the jury in the amount found 'just' under all the circumstances. (Stats. 1862, p. 447.) Ten years after its enactment, the statute was amended to remove the words 'pecuniary or exemplary,' retaining the language that 'damages may be given as under all the circumstances of the case, may be just, . . .' (Code Civ. Proc., § 377.) Nonetheless, in subsequent decisional law a theory developed that damages for wrongful death were recoverable only for the 'pecuniary' losses suffered by the decedent's heirs. [Citations omitted.]

■ "California case law, however, has not restricted wrongful death recovery only to those elements with an ascertainable economic value, such as loss of household services or earning capacity. On the contrary, as early as 1911, we held that damages could be recovered for the loss of a decedent's 'society, comfort and protection' (*Bond* v. *United Railroads* (1911) 159 Cal. 270, 286 [113 P. 366]), though only the 'pecuniary value' of these losses was held to be a proper element of recovery. Other cases have held admissible such evidence as the closeness of the family unit (*Griott* v. *Gamblin* (1961) 194 Cal.App.2d 577, 578-579 [15 Cal.Rptr. 228]), the warmth of feeling between family members (*Benwell* v. *Dean* (1967) 249 Cal.App.2d 345, 349 [57 Cal.Rptr. 394]), and the character of the deceased as 'kind and attentive' or 'kind and loving' (*Cook* v. *Clay Street Hill R. R. Co.* (1882) 60 Cal. 604, 609). Not only was wrongful death compensation awarded historically to heirs who had been financially dependent upon their deceased relatives, but adult children received substantial awards for the wrongful death of retired, elderly parents (e.g., *Griott* v. *Gamblin, supra*) and parents received compensatory damages for the death of young children (e.g., *Parsons* v. *Easton, supra,* 184 Cal. 764; *Daggett* v. *Atchison T. & S. F. Ry. Co.*

(1957) 48 Cal.2d 655, 666 [313 P.2d 557]). These cases suggest a realization that if damages truly were limited to 'pecuniary' loss, recovery frequently would be barred by the heirs' inability to prove such loss. The services of children, elderly parents, or nonworking spouses often do not result in measureable net income to the family unit, yet unquestionably the death of such a person represents a substantial 'injury' to the family for which just compensation should be paid." (*Krouse* v. *Graham* (1977) 19 Cal.3d 59, 67-68 [137 Cal.Rptr. 863, 562 P.2d 1022].)

■ In this case, respondents, through the testimony of Debbie's mother, father and sister presented abundant evidence of closeness of the family unit and of Debbie's loving kindness and nature to both father and mother.

This testimony was uncontradicted on the record. We have reviewed the entire record in this case and are satisfied that there was substantial evidence for the jury to determine that each respondent suffered a great loss of comfort and society due to Debbie's death and that a pecuniary value could be assigned to that loss.

■ "It is an elementary, but often overlooked principle of law, that when a verdict is attacked as being unsupported, the power of the appellate court begins and ends with a determination as to whether there is any substantial evidence, contradicted or uncontradicted, which will support the conclusion reached by the jury. When two or more inferences can be reasonably deduced from the facts, the reviewing court is without power to substitute its deductions for those of the trial court (citations omitted)." (*Crawford* v. *Southern Pacific Co.* (1935) 3 Cal.2d 427, 429 [45 P.2d 183].)

■ "Our power over excessive damages exists only when the facts are such that the excess appears as a matter of law, or is such as to suggest at first blush, passion, prejudice, or corruption on the part of the jury. (Citations omitted.) Practically, the trial court must bear the whole responsibility in every case." (*Bond* v.*United Railroads* (1911) 159 Cal. 270, 286 [113 P. 366].)

■ Appellant cites seven California decisions which he claims strongly suggest that the verdict in this case was excessive and the product of a run away jury. The cases stand for no such proposition.[13]

---

[13] In *Bunton* v. *Arizona Pacific Tanklines* (1983) 141 Cal.App.3d 210 [190 Cal.Rptr. 295], the jury awarded $572,307. The trial court entered an order conditionally granting a new trial. The new trial was conditioned on plaintiff's acceptance of a remittitur. But the appellate court reversed the trial department and affirmed the judgment.

The trial judge had an opportunity to review the evidence in this case at the time of the hearing on the motion for a new trial. We have also independently reviewed the evidence.

The mere fact that the judgment is large does not validate an appellant's claim that the verdict is the result of passion or prejudice of the jury. Each case must be determined on its own facts. ██ "It is only in a case where the amount of the award of general damages is so disproportionate to the injuries suffered that the result reached may be said to shock the conscience, that an appellate court will step in and reverse a judgment because of greatly excessive or grossly inadequate general damages." (*Daggett* v. *Atchison, T. & S.F.Ry. Co.* (1957) 48 Cal.2d 655, 666 [313 P.2d 557, 64 A.L.R.2d 1283].) ██ That result which requires reversal should clearly appear from the record. We are unable to say, as a matter of law, that the

---

In *Foss* v. *Anthony Industries* (1983) 139 Cal.App.3d 794 [189 Cal.Rptr. 31], the appellate court reversed on the issue of damages because of a prejudicial error of the trial court in ruling on the admissibility of evidence.

In *Coleman* v. *Gulf Ins. Group* (1986) 41 Cal.3d 782 [226 Cal.Rptr. 90, 718 P.2d 77], plaintiffs obtained a judgment for $350,000. The parties settled for $300,000 while the case was on appeal. The appeal was subsequently dismissed. Thereafter, plaintiffs filed a suit against defendant's insurance company seeking to recover additional compensation and punitive damages on the basis of defendant's conduct in the original appeal and sought recovery on four different theories: (1) Bad faith refusal to pay insurance benefits; (2) violation of Insurance Code section 790.03, subdivision (h)(5)'s requirement to attempt good faith settlement; (3) malicious prosecution of an appeal; and (4) abuse of process. The trial court sustained defendant's demurrer as to all causes of action without leave to amend and the Supreme Court affirmed the ruling.

In both *Canavin* v. *Pacific Southwest Airlines* (1983) 148 Cal.App.3d 512 [196 Cal.Rptr. 82] and *Fox* v. *Pacific Southwest Airlines* (1982) 133 Cal.App.3d 565 [184 Cal.Rptr. 87], the trial department committed reversible error by improperly instructing the jury.

In *Tramell* v. *McDonnell Douglas Corp.* (1984) 163 Cal.App.3d 157 [209 Cal.Rptr. 427], the trial court granted defendants' motion for a new trial on the grounds of excessive damages, conditioned on plaintiffs' accepting a reduction of the verdict from $4,138,000 to $1,862,100. The trial judge chose to include misconduct of the jury as a reason for his conclusion that damages were excessive. In that case, the declaration of the foreperson submitted by the defendant, which the trial court found to be true, involved a discussion dealing with the specifics of attorney's fees, including percentages, and income taxes, both state and federal. " 'Upon appellate review of an order granting a new trial, "all intendments are in favor of the action taken by the lower court [and] the affidavits in behalf of the prevailing party are deemed not only to establish the facts directly stated therein, but all facts reasonably inferred from those stated." [Citations.]

" ' . . . . . . . . . . . . . . . . . .

" ' "When an issue is tried on affidavits . . . and where there is substantial conflict in the facts stated, a determination of the controverted facts by the trial court will not be disturbed." [Citation.]' " (*Tramell* v. *McDonnell Douglas Corp., supra,* at p. 172, quoting *Weathers* v. *Kaiser Foundation Hospitals* (1971) 5 Cal.3d 98, 106-108 [95 Cal.Rptr. 516, 485 P.2d 1132].)

Finally, the verdict in *Allen* v. *Toledo* (1980) 109 Cal.App.3d 415 [167 Cal.Rptr. 270], was affirmed as not excessive.

judgment in this case is so excessive as to warrant us in interfering with the finding of the jury.[14]

## SHOULD THIS COURT SUBSTANTIALLY REDUCE THE JURY AWARD?

Finally, appellant maintains that the verdict should be substantially reduced pursuant to the court's inherent authority to do so. In view of our discussion in other portions of this opinion concerning the jury award, no further discussion of appellant's suggestion is warranted.

The judgment is affirmed.

Feinerman, P. J., and Ashby, J., concurred.

A petition for a rehearing was denied December 30, 1987, and appellant's petition for review by the Supreme Court was denied March 2, 1988.

---

[14] The jury was provided with a formula for calculating and assigning a monetary value to the loss of comfort and society of Debbie for each of her parents for each day of their anticipated lives. The jury instructions included BAJI No. 14.69 on the life expectancy of each plaintiff and BAJI No. 14.70, a present value table. We are further persuaded that there was a lack of passion or prejudice on the part of the jury when we note that the jury assigned a 40 percent comparative responsibility to the deceased herself.