Filed 9/16/14  P. v. Ojeda CA2/7

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>GABRIEL ANDREW OJEDA,<br><br>    Defendant and Appellant. | B246956<br><br>(Los Angeles County<br>Super. Ct. No. KA096499) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Bruce F. Marrs, Judge.  Reversed.

Robert Bryzman, under appointment by the Court of Appeal, for Defendant Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Victoria B. Wilson and Mark E. Weber, Deputy Attorneys General, for Plaintiff and Respondent.

_____

Gabriel Andrew Ojeda appeals from the judgment entered after a jury convicted him of both aggravated assault and simple assault and found true the allegation he had personally caused great bodily injury. Ojeda contends the trial court erred in denying his motion for a new trial on the ground of jury misconduct. We reverse.

## FACTUAL AND PROCEDURAL BACKGROUND

1. *The Assault*

On December 28, 2011 at approximately 10:30 p.m., Jason Balibrea was crossing a street in Glendora and passed a silver Toyota stopped at the intersection. A man later identified as Ojeda got out of the passenger seat, approached Balibrea and punched him in the jaw. Balibrea fell down, and Ojeda repeatedly kicked and punched him. The driver of the Toyota, later identified as Mark Hachem, joined in the assault. Balibrea's friend Jesse Morales, who claimed he saw the assault on his way to meet Balibrea at his house, got out of his car and approached the men carrying a baseball bat. Ojeda and Hachem ran back to their car and drove away, but not before Morales smashed the windshield of the Toyota with the bat.[1]

2. *The Identification of Ojeda*

Balibrea's jaw was broken in the assault. Interviewed at the hospital, he told a Glendora police officer he did not recognize his attackers but believed the first man had used brass knuckles because his punch was so powerful. Morales told the same officer

---

[1] The assault was also witnessed by a passenger in the car behind the Toyota, who testified two men in a silver sedan attacked a pedestrian. She did not see a man with a bat approach the sedan before it drove away. She saw the pedestrian holding a bat before getting into a second car and driving away.

The record contains various explanations how the four men came to be at the intersection at the same time. Balibrea testified at trial he was walking home alone from his girlfriend's house. However, he sent an online message soon after the attack stating he and Morales had been followed by the Toyota and he was attacked by someone he did not know when he got out of the car to confront them. Morales testified at trial he was driving to meet Balibrea and his girlfriend at Balibrea's house but had testified at the preliminary hearing he intended to meet them at the intersection. Balibrea and Morales also gave contradictory accounts of being chased by—or chasing—the Toyota at different times earlier that day.

"Gabe" and "Markie" were the assailants and he knew where they lived. Morales accompanied the officer to Hachem's house and identified a silver Toyota in the driveway as the car driven by the attackers.[2] Morales also viewed two photographic lineups and identified Ojeda and Hachem as the men who had attacked Balibrea. Balibrea, also shown a photographic lineup, identified Ojeda as his attacker but said he was only "67 percent sure" because the man had been wearing a hat.[3]

### 3. *Ojeda's Alibi*

A detective arrested Ojeda the day after the assault. In an interrogation played for the jury, Ojeda denied he had been with Hachem the previous night and first stated he had been at his girlfriend's house. When told the police knew he had not been with his girlfriend until later that night, Ojeda claimed he had been walking alone in San Dimas Canyon.

The same detective interviewed Ojeda's girlfriend, Jordan Kitt, at her home shortly after Ojeda's arrest. Kitt initially told the detective she had been with Ojeda from 10:30 p.m. on, and he had spent the night at her house. She allowed the detective to search her house. With Kitt's permission the detective searched her cell phone. Texts between Ojeda and Kitt showed that Kitt was waiting for Ojeda at her home at approximately 9:58 p.m. when Ojeda texted her he was "[i]n his car hold on." Kitt sent another text saying, "That's sketchy Gabriel. Please be careful." Ojeda answered her, "No it's not. I know them." At 10:13 p.m. Ojeda told Kitt he wanted her to pick him up but did not give a location. Kitt drove to Ojeda's house, but he was not there. At 10:48 p.m. when Ojeda still had not appeared, she texted, "Where is your ass?" Ojeda

---

[2]    The next day the officer took photographs of the car, which had a broken windshield.

[3]    Three weeks before the attack on Balibrea, he had witnessed an assault by two men on his friend, Eric Garcia. Garcia identified Ojeda as one of the attackers in the assault and told Morales Ojeda had been involved. A week before the attack on Balibrea, Balibrea identified Ojeda in a photographic lineup as one of Garcia's attackers. The prosecution's theory of the case was that Balibrea was targeted because he had identified Ojeda and was scheduled to testify against him at trial.

replied, "Coming." At 10:51 p.m. Kitt again asked him where he was. Ojeda answered, "Like five min." Kitt sent several more messages between 10:52 and 10:57 p.m. Ojeda was dropped off at his house by a blue pickup truck at 11:00 p.m.

4. *The Charges*

Ojeda was charged with one count of assault by means likely to produce great bodily injury (Pen. Code, § 245, subd. (a)(1)),[4] including additional allegations he had personally used brass knuckles, a deadly weapon within the meaning of section 12022, subdivision (b)(1), and had personally inflicted great bodily injury within the meaning of section 12022.7, subdivision (a); one count of assault with a deadly weapon (brass knuckles) (§ 245, subd. (a)(1)), with an allegation he had personally inflicted great bodily injury within the meaning of section 12022.7, subdivision (a); and one count of intimidation of a witness (§ 137, subd. (b)). The information alleged as to all counts the offenses were committed while Ojeda had been released from custody on bail in another case.[5]

5. *Ojeda's Defense*

Ojeda's father and Kitt testified Ojeda had accidentally smashed the middle finger on his left hand while chopping wood on December 10, 2011. He lost the fingernail on that finger; the wound was stitched; and the hand was bandaged. As of December 28, 2011 the stitches had been removed but he still could not use his left hand.

Ojeda did not testify. In closing his counsel argued Ojeda had been framed by Garcia, Morales and Balibrea. As evidence supporting this theory, Ojeda's counsel pointed to Balibrea's initial assertion he did not know his attackers when there was substantial evidence he was well acquainted with them, as well as the shifting testimony of Balibrea, Morales and Garcia.

---

[4] Statutory references are to the Penal Code unless otherwise indicated.

[5] The same information charged Hachem with aggravated assault and witness intimidation. Ojeda and Hachem were tried together before separate juries. Hachem was convicted as charged and has filed his own appeal. (*People v. Hachem*, B250009.)

6. *The Verdicts*

After approximately six hours of deliberations, the jury sent a note to the court advising the jurors were evenly split and could not agree on the verdicts. The court, after consulting with counsel, directed the jurors to continue deliberating. They reached verdicts the next morning,[6] finding Ojeda guilty of aggravated assault (count 1), guilty of the lesser included offense of simple assault (count 2) and not guilty on the witness intimidation charge (count 3). The jury found true the allegation Ojeda had personally inflicted great bodily injury on count 1 but found the allegation he had used a deadly weapon not true. The jury was polled individually, and each juror affirmed his or her verdict on each of the three counts. The court made a true finding on the bail enhancement.

7. *The Motion for a New Trial*

Ojeda moved for a new trial based on juror misconduct, attaching a supporting declaration from Juror 11, W.Y.[7]

At a hearing on the motion W.Y. testified the initial vote of the jurors at the commencement of deliberations was eight to four for acquittal on count 1 and 11 to one on counts 2 and 3. The jury decided to defer consideration of count 1. When the deliberations on count 1 began the next morning, Juror 2 commented that Ojeda should have taken the stand if he had nothing to hide. Juror 7 and two other jurors agreed. The foreperson and W.Y. both reminded their fellow jurors their decision should be based on the evidence and not on Ojeda's failure to testify. Juror 7 responded, "[I]f that was me, I would have testified so I wouldn't get in trouble." Someone else commented Ojeda might not want to identify the perpetrator so he would not get in trouble. Juror 7 again stated, "[I]f that was me, I don't care who got in trouble, I would testify myself." The

---

[6]     The jury deliberated over the course of three days, starting on the afternoon of October 2, 2012 and ending on the morning of October 4, 2012.

[7]     W.Y. stated she became concerned several days after the verdicts were returned because Kitt's mother was a work colleague. Kitt's mother directed Ojeda's counsel to W.Y.

discussion of Ojeda's failure to testify lasted "a good 30 minutes, plus" and was mentioned "throughout the second and third day of deliberations." When one juror commented the jurors arguing for conviction were too emotional, those jurors responded Ojeda must be guilty because he did not testify. Regarding the text messages with Kitt, the same jurors argued his failure to explain where he had been that night meant he was hiding something and must have been guilty.

W.Y. testified the four jurors who insisted Ojeda should have testified were the ones who had initially voted to convict Ojeda on count 1. W.Y. was one of the last jurors to switch her vote to guilty on count 1. W.Y. also testified Juror 4 had pulled out his cell phone at the start of deliberations and, when asked for his views, repeatedly passed and stated he would agree with whatever the majority said.

The trial court denied the motion for a new trial, emphasizing the lack of hesitation or doubt among jurors when polled. The court cited *People v. Hord* (1993) 15 Cal.App.4th 711 (*Hord*) as persuasive in this case and found that, although some misconduct had occurred, it was not prejudicial.[8]

8. *Sentencing*

Pursuant to a negotiated agreement in an unrelated case, Ojeda pleaded guilty to one count of first degree residential burglary (§ 459) and admitted the residence had been occupied when the crime was committed; the court imposed a four-year sentence. With respect to this case the court sentenced Ojeda to a state prison term of four years, consisting of one year for his conviction on count 1 (one-third the middle term), plus one year for the great bodily injury enhancement (one-third the term for the enhancement), plus two years for the bail enhancement; stayed sentence on count 2 under section 654;

---

[8]     The court explained, "I agree with *Hord* that there was some misconduct. I don't believe that, taken as a whole, considering the evidence that was heard in this particular, and I'm recalling the lady and the child in the car directly behind the defendant's car whose testimony seemed to be rather credible, and the length of time the jury deliberated and the alacrity with which they expressed that the verdicts were their individual votes, I find the conduct not to be prejudicial."

and ordered victim restitution in the amount of $19,675.72 (plus interest) and associated fees and fines.

## DISCUSSION

1. *Law Governing New Trial Motions Based on Juror Misconduct; Standard of Review*

"An accused has a constitutional right to a trial by an impartial jury. [Citations.] An impartial jury is one in which no member has been improperly influenced [citations] and every member is '"capable and willing to decide the case solely on the evidence before it."'" (*In re Hamilton* (1999) 20 Cal.4th 273, 293-294.) Code of Civil Procedure section 657 identifies seven grounds for a new trial motion, including jury misconduct. When a party seeks a new trial based on jury misconduct, the court undertakes a three-step inquiry. First, the court must determine whether the declarations offered in support of the motion are admissible under Evidence Code section 1150.[9] If they are, the court must next consider whether the facts establish misconduct. Finally, assuming misconduct is found, the court must determine whether it was prejudicial. (*People v. Duran* (1996) 50 Cal.App.4th 103, 112-113; *Hord*, *supra,* 15 Cal.App.4th at p. 724.)

Ordinarily, a trial court's determination of a motion for new trial will not be disturbed "unless a manifest and unmistakable abuse of discretion clearly appears" (*Jiminez v. Sears, Roebuck & Co.* (1971) 4 Cal.3d 379, 387), and "[w]e accept the trial court's credibility determinations and findings on questions of historical fact if supported by substantial evidence." (*People v. Nesler* (1997) 16 Cal.4th 561, 582.) The question "[w]hether prejudice arose from juror misconduct, however, is a mixed question of law and fact subject to an appellate court's independent determination." (*Ibid.*; accord, *People v. Ault* (2004) 33 Cal.4th 1250, 1261-1262.) "Although juror misconduct raises a

---

[9] Evidence Code section 1150, subdivision (a), provides: "Upon an inquiry as to the validity of a verdict, any otherwise admissible evidence may be received as to statements made, or conduct, conditions, or events occurring, either within or without the jury room, of such a character as is likely to have influenced the verdict improperly. No evidence is admissible to show the effect of such statement, conduct, condition, or event upon a juror either in influencing him to assent to or dissent from the verdict or concerning the mental processes by which it was determined."

7

presumption of prejudice [citations], we determine whether an individual verdict must be reversed for jury misconduct by applying a substantial likelihood test. That is, the 'presumption of prejudice is rebutted, and the verdict will not be disturbed, if the entire record in the particular case, including the nature of the misconduct or other event, and the surrounding circumstances, indicates there is no reasonable probability of prejudice, i.e., no *substantial likelihood* that one or more jurors were actually biased against the defendant.'" (*In re Boyette* (2013) 56 Cal.4th 866, 889-890.) Conversely, "[i]f the record shows a substantial likelihood that even one juror 'was impermissibly influenced to the defendant's detriment,' reversal is required regardless of whether the court is convinced an unbiased jury would have reached the same result." (*People v. Cissna* (2010) 182 Cal.App.4th 1105, 1116-1117 (*Cissna*); see *In re Carpenter* (1995) 9 Cal.4th 634, 654 ["[u]ltimately, the test for determining whether juror misconduct likely resulted in actual bias is 'different from, and indeed less tolerant than,' normal harmless error analysis, for if it appears substantially likely that a juror is actually biased, we must set aside the verdict, no matter how convinced we might be that an unbiased jury would have reached the same verdict"].)

2. *Juror Misconduct Created a Presumption of Prejudice That Was Not Adequately Rebutted*

There is no contention in this case the statements made by several jurors, as described by W.Y., are inadmissible.[10] Nor do the parties disagree that many of the juror

_____

[10]    Only evidence of "'objective facts'" is admissible to prove juror misconduct. (*In re Stankewitz* (1985) 40 Cal.3d 391, 397.) Evidence regarding how such objective facts may have influenced jurors' subjective thought processes is inadmissible to impeach a verdict. (*Ibid.*) "Thus, jurors may testify to 'overt acts'—that is, such statements, conduct, conditions, or events as are 'open to sight, hearing, and the other senses and thus subject to corroboration'—but may not testify to 'the subjective reasoning processes of the individual juror . . . .'" (*Id.* at p. 398; accord, *Cissna, supra,* 182 Cal.App.4th at p. 1116; see *People v. Hedgecock* (1990) 51 Cal.3d 395, 419 ["when a juror in the course of deliberations gives the reasons for his or her vote, the words are simply a verbal reflection of the juror's mental processes"].) "'This limitation prevents one juror from upsetting a verdict of the whole jury by impugning his own or his fellow jurors' mental

8

statements described by W.Y. constituted misconduct. The only issue presented in this appeal is whether the presumption of prejudice arising from that misconduct has been rebutted. It has not.

"The [substantial likelihood] standard is a pragmatic one, mindful of the 'day-to-day realities of courtroom life' [citation] and of society's strong competing interest in the stability of criminal verdicts . . . ." (*In re Hamilton, supra,* 20 Cal.4th at p. 296.) Courts must bear in mind "the jury is a 'fundamentally human' institution; the unavoidable fact that jurors bring diverse backgrounds, philosophies, and personalities into the jury room is both the strength and the weakness of the institution. . . . If the system is to function at all, we must tolerate a certain amount of imperfection short of actual bias.'" (*Ibid.*) The question thus becomes whether the juror comments in this case ran afoul of our tolerance for imperfection and manifested actual bias in violation of Ojeda's Sixth Amendment right to an impartial jury.[11]

The People contend the trial court properly likened this case to the decision in *Hord, supra,* 15 Cal.App.4th 711 in concluding the jury's discussion of the defendant's

processes or reasons for assent or dissent.'" (*People v. Steele* (2002) 27 Cal.4th 1230, 1261.)

However, the misuse of juror statements to improperly open the reasoning process to scrutiny is not "threatened when . . . the very making of the statement sought to be admitted would itself constitute misconduct. Such an act is as much an objective fact as a juror's reading of a novel during the taking of testimony [citation] or a juror's consultation with an outside attorney for advice on the law applicable to the case." (*In re Stankewitz, supra,* 40 Cal.3d at p. 398 [declarations that juror who had been a police officer for more than 20 years gave legal advice about case based on his purported familiarity with criminal law were admissible]; *People v. Hedgecock, supra,* 51 Cal.3d at p. 419 ["[i]n rare circumstances a statement by a juror during deliberations may itself be an act of misconduct, in which case evidence of that statement is admissible"].)

[11] "'Actual bias' in this context does not mean that a juror must dislike the defendant or harbor a desire to treat him unfairly. Rather, '[t]he Sixth Amendment right to an impartial jury and the due process right to a fundamentally fair trial guarantee to criminal defendants a trial in which jurors set aside preconceptions, disregard extrajudicial influences, and decide guilt or innocence "based on the evidence presented in court."'" (*In re Boyette, supra,* 56 Cal.4th at p. 899 (dis. opn. of Corrigan, J.), quoting *Skilling v. United States* (2010) 561 U.S. 358, 438 [130 S.Ct. 2896, 177 L.Ed.2d 619].)

9

failure to testify revealed no actual bias.  In *Hord*, a child molestation case, several jurors commented during deliberations on the defendant's failure to testify.  (*Id.* at pp. 721-722.)  After the foreperson interrupted the discussion to warn jurors they were not permitted to consider the defendant's failure to testify in deciding the case, there was no further discussion of the matter.  (*Id.* at p. 722.)  The trial court denied the defendant's motion for a new trial without an evidentiary hearing (*id.* at p. 723), and the Court of Appeal affirmed.  As the court explained, "When jury deliberations have been infiltrated with a matter which is prohibited, one must look at the nature of what has improperly infiltrated the procedure and the possibility of prejudice."  (*Id.* at p. 727.)  "Transitory comments of wonderment and curiosity, although misconduct, are normally innocuous, particularly when a comment stands alone without any further discussion."  (*Id.* at pp. 727-728; accord, *People v. Manibusan* (2013) 58 Cal.4th 40, 59.)  Because the comments were brief and the foreperson had cautioned his fellow jurors not to consider the defendant's failure to testify, the court concluded the presumption of prejudice had been rebutted.  (*Hord*, at p. 728.)

Similarly, in *People v. Leonard* (2007) 40 Cal.4th 1370 (*Leonard*) several jurors discussed the defendant's failure to testify during penalty phase deliberations and agreed they would have liked to have heard him testify.  (*Id.* at p. 1424.)  The defendant claimed the discussion constituted prejudicial misconduct.  Although the Supreme Court agreed the jurors had committed misconduct, it found the presumption of prejudice had been rebutted:  "[T]he purpose of the rule prohibiting jury discussion of a defendant's failure to testify is to prevent the jury from drawing adverse inferences against the defendant, in violation of the constitutional right not to incriminate oneself.  Here, the comments on defendant's failure to testify . . . merely expressed regret that defendant had not testified, because such testimony might have assisted the jurors in understanding him better."  (*Id.* at p. 1425.)  The Supreme Court agreed with the trial court's conclusion that the desire to hear defendants testify is "natural" and "'merely referencing that they wish he would have testified is not the same as punishing the Defendant for not testifying.  It is not the same as drawing negative inferences from the absence of testimony.'"  (*Ibid.*; see *People v. Loker*

(2008) 44 Cal.4th 691, 749 ["[i]t is natural for jurors to wonder about a defendant's absence from the witness stand," but "comments were brief and played no role in the jury's penalty deliberations"].)

Ojeda argues the degree of misconduct in this case more closely resembles that in *Cissna, supra,* 182 Cal.App.4th 1105, than in *Hord.* In *Cissna,* also a child molestation case, one of the jurors discussed the trial with a friend on a daily basis. (*Id.* at p. 1114.) The friend advised the juror on how he should consider the evidence and explicitly told the juror the defendant's failure to testify meant he was guilty. (*Id.* at pp. 1114-1115.) The *Cissna* court concluded the juror's nightly conferences— which were "both pervasive (occurring every single day of the trial) and substantive (involving deliberative-type discussion about the merits of the case" (*id.* at p. 1118)—resulted in actual bias that "obviated the defendant's constitutional right not to have his silence play any role in his conviction." (*Id.* at p. 1121.)

We agree with Ojeda that the juror comments reported by W.Y. exceeded the incidental musing about a defendant's failure to testify described in *Hord* and *Leonard*, which ceased once the offending jurors were cautioned. As *Hord* recognized, "When comments go beyond natural curiosity and their content suggests inferences from forbidden areas, the chance of prejudice increases. For example, if a juror were to say, 'The defendant didn't testify so he is guilty,' . . . the comments go beyond mere curiosity and lean more toward a juror's drawing inappropriate inferences from areas which are off limits. Such comments are more likely to influence that juror and other jurors." (*Hord, supra,* 15 Cal.App.4th at p. 728.)

In this case several jurors reasserted through a day and a half of deliberations that Ojeda, if not guilty, should have taken the stand and explained his actions. The comments were made both before and after the foreperson and W.Y. attempted to refocus their fellow jurors on the evidence before them. (See *Hord*, *supra,* 15 Cal.App.4th at p. 726 ["[t]here is no indication in the declarations presented to the trial court here 'of any open discussion or agreement among the jurors evidencing a deliberate refusal to follow the court's instructions'"]; *People v. Perez* (1992) 4 Cal.App.4th 893, 908

11

["evidence of a jury's explicit or implicit agreement to violate a court's instruction does not touch upon the juror's subjective reasoning processes, since . . . such agreement in and of itself constitutes misconduct"]; *DiRosario v. Havens* (1987) 196 Cal.App.3d 1224, 1235 ["if the jurors in this case made their decision based upon an intentional collective disregard of [a jury instruction] . . . then such activity would be grounds for seriously considering reversal of the judgment"].)  With the exception of the four jurors who agreed Ojeda would have testified if he were not guilty, the other jurors commenced deliberations unconvinced of Ojeda's guilt.  On the afternoon of the following day the foreperson reported the jury was deadlocked, indicating that the majority in favor of acquittal was eroding.  Eventually, what began as a vote to acquit on count 1 evolved into a vote to convict on the morning of the third day of deliberations.  Under these circumstances it is impossible to conclude there was not a single juror whose vote was swayed by improper consideration of Ojeda's failure to testify.[12]

## DISPOSITION

The judgment is reversed.  The order denying Ojeda's motion for a new trial is vacated, and the matter is remanded for a new trial.


PERLUSS, P. J.

We concur:


WOODS, J.                    SEGAL, J.[*]

[12]     We need not discuss Ojeda's alternate argument that Juror 4's refusal to meaningfully participate in deliberations constitutes a separate ground to reverse his conviction other than to note W.Y.'s description of his conduct further undermines our confidence in the original verdicts.  (See *People v. Boyette* (2002) 29 Cal.4th 381, 427 ["The law requires each juror's independent vote, and '"[u]nanimity obviously requires that each juror must vote for and acquiesce in the verdict.  Acquiescence simply because the verdict has been reached by the majority is not an independent judgment, and if permitted would undermine the right to a unanimous verdict."'"].)

[*]     Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.