[No. B014233. Second Dist., Div. One. Mar. 30, 1990.]

JERRY EUGENE WRIGHT, SR., et al., Plaintiffs and Appellants, v. CITY OF LOS ANGELES et al., Defendants and Appellants.

COUNSEL

Michaelson & Levine, Alvin S. Michaelson, Janet I. Levine and Robert L. Shapiro for Plaintiffs and Appellants.

James K. Hahn, City Attorney, John T. Neville, Assistant City Attorney, and Katherine J. Hamilton, Deputy City Attorney, for Defendants and Appellants.

OPINION

SPENCER, P. J.—

## INTRODUCTION

This action arises out of the death of Jerry Eugene Wright, Jr. Plaintiffs and appellants are his parents, Jerry Eugene Wright, Sr., and Ethel Mae Wright, and brother and sister, Donald Troy Wright and Sharon Carol Wright. Defendants and appellants are the City of Los Angeles, Los Ange-

les Police Department Officer Robert Saurman and Los Angeles Fire Department Paramedic Daniel Maloney.

On March 31, 1980, plaintiffs filed their complaint against these defendants, and several others later dismissed, for wrongful death (negligence—count 1; false imprisonment—count 2; and assault and battery—count 3); negligent infliction of emotional distress—count 6; intentional infliction of emotional distress—counts 7 and 11; false imprisonment—count 8; and deprivation of constitutional rights—counts 4-5 and 9-10.

The fifth and tenth causes of action were dismissed prior to trial. The trial began on March 11, 1985. After the plaintiffs had rested, the trial court granted defendants' motion for nonsuit pursuant to Code of Civil Procedure section 581c as to count 4 (deprivation of constitutional rights under 42 U.S.C. § 1983) and as to count 9 (deprivation of constitutional rights under the First, Fourth, Ninth, and Fourteenth Amendments). The trial court granted defendants' motion for nonsuit as to defendants Lovan, Titiriga, and Arbeit, which rulings plaintiffs do not appeal. The trial court also granted defendants' motion for nonsuit as to plaintiffs Jerry Eugene Wright, Sr., and Darlene Buckhanon in count 8 (false imprisonment) and as to plaintiffs Darlene Buckhanon and George Buckhanon in count 11 (intentional infliction of emotional distress).

The jury found for plaintiffs on the first cause of action (for wrongful death) and awarded $2 million damages, and on the sixth cause of action (for negligent infliction of emotional distress) and awarded $100,000 damages. On May 17, 1985, the trial court granted motions for judgment notwithstanding the verdict (JNOV) as to those two causes of action. The trial court alternatively granted a motion for a new trial as to these causes of action should the JNOV not be sustained on appeal. The jury found for defendants on the second, third, seventh, eighth and eleventh causes of action.

Plaintiffs filed a notice of appeal on May 20, 1985. On June 3, 1985, defendants filed a notice of cross-appeal. Plaintiffs appeal from the judgments of nonsuit, the judgments in favor of defendants and the JNOV's. Defendants cross-appeal as a protective measure.

STATEMENT OF FACTS

*Witnesses Delores Carter Williams and Robin Walker*

On May 19, 1979, Delores Carter Williams (Williams) and Robin Walker (Walker) were staying at 3910 Coco in apartment number 8. At 2:15 or 2:30

a.m., Williams heard loud footsteps coming from more than one person and heard someone screaming, "Help, police, I'm being robbed." Walker also heard the screaming. They went to a window and looked out. Williams initially could not see anyone, but Walker saw a fat man picking up a skinny man and hitting him up against the side of a Vega automobile.

They thought the man screaming sounded like Williams's brother, and Williams called out her brother's name. The man responded that he was Jerry Eugene Wright (Jerry) and he lived at 3910 Coco in apartment number 1; he asked them to go get help. At this point, Williams was able to see the two men. She saw the other man beating Jerry; Jerry tried to get into the Vega, but the other man pulled him away and beat him. Williams then left to get help.

Walker watched the fight and saw the fat man continue to punch and hit Jerry while Jerry tried to defend himself. Then a man came out of an apartment across the street and hit the fat man, who fell under the Vega. The man then helped Jerry into the Vega and ran back across the street. It appeared to Walker as though Jerry was having difficulty moving; he seemed exhausted. He started up the Vega, it rolled backwards, then stopped; Jerry just sat there. It looked to Walker as though the Vega might have run over the fat man when it rolled back. Neither she nor Williams saw the automobile move again.

Walker then saw a police vehicle arrive with two officers inside. They got out of their vehicle; one had his gun drawn and pointed at Jerry. They told Jerry to come out of the Vega and put his hands up; Jerry did not comply, but remained in the automobile slouched and leaning against the back of the driver's seat. Walker heard another guest in apartment number 8, Alisha Jackson, holler to the police not to shoot, that Jerry could not get out of the automobile or put his hands up because he was beaten up or hurt, and that the man on the ground had done it. The officers opened the passenger door on the Vega and got Jerry out of the automobile and onto the parkway; Walker did not see how they accomplished this, because the officers were blocking her view. Jerry was half on the grass and half in the gutter; one of the officers kicked Jerry over into the gutter. Walker then saw Jerry lying face down on the grass parkway with his hands cuffed behind his back.

Meanwhile, Williams had gone to apartment number 1 and knocked on the door; Jerry's brother answered. She asked if anyone there knew Jerry and said he was being beaten up and needed help. They went to the front of the building and found two police officers there, who would not permit them to go past the front gate. Williams then returned to apartment number 8; she went to a window and observed the police ask Jerry to get out of the

Vega; she did not notice whether they had their weapons drawn. Jerry began moving toward the passenger side of the automobile, but he appeared to have difficulty moving. When he got to the door, the police grabbed him and pulled him out; he fell and landed on his back. One of the officers poked him with a baton, but he did not move. The other officer pushed him over onto his stomach, put his hands behind him and handcuffed him. At this point, Jerry was lying on the grass parkway, with his head leaning over the sidewalk; one of the officers kicked him between his neck and shoulders and moved his head back onto the grass.

Williams heard Jerry loudly complaining that his head hurt; Walker could not remember Jerry saying how he felt. Both women heard him ask for water. An ambulance with two paramedics arrived; the paramedics got out and came to within three to five feet of Jerry. Williams heard one of them say, " 'He's loaded.' " Neither woman saw the paramedics touch Jerry or take his pulse or blood pressure. The paramedics then left. Jerry continued to ask for water; neither Williams nor Walker ever saw anyone bring him water.

Williams heard someone—she thought it was Jerry's mother, who had come out of the apartment building—request a blanket for Jerry; eventually, one was provided. Williams and Walker saw a second pair of paramedics arrive, look at Jerry, and put a blanket over his head.

Walker estimated that it was 15 minutes from the time she first heard the fight until the time the police arrived. Williams estimated it was 25 to 30 minutes from the time she came out of the apartment building until the time the second pair of paramedics arrived. Williams indicated the light in the area was not good; as a result, neither woman was able to identify the police officers involved.

*Donald Troy Wright and Sharon Carol Wright*

Donald Troy Wright (Donald) and Sharon Carol Wright (Sharon) were Jerry's brother and sister. Donald was two years older than Jerry and Sharon one year older. At the time of his death, Jerry was 20 years old. All three lived with their mother at 3910 Coco in apartment number 1.

Early in the morning on May 19, 1979, they heard knocking on their door. Donald answered and a young lady asked if he knew Jerry Eugene Wright; he said he did. She told him Jerry was outside getting beaten up in a fight. He quickly went outside, where he saw Jerry in the Vega on the passenger side, "kind of wiggling . . . from the side, like he was in some type of pain or shock," with his eyes opened wide. His head was tilted

backwards over the seat, and he looked like he was having difficulty "healthwise." Donald also saw two police officers there; one was on the driver's side of the Vega with a gun pointed in Jerry's direction, and the other was on the passenger side shining a flashlight on Jerry. Jerry wiggled to the door and somehow got out of the automobile; Donald could not see how, in that the police officers were blocking his view.

One of the officers took Donald to the man who had beaten Jerry, who was lying in the street, and asked whether he knew the man; he said he did not. Donald then saw Jerry lying face down on the parkway with handcuffs on. The officers took him over to Jerry and asked whether he knew what happened to him; again, he said he did not. He returned to the apartment building and knocked on the window—he had not brought his keys to the security gate—until Sharon came; he told her to come outside, that Jerry had been beaten up. Donald returned to where Jerry was and noticed paramedics had arrived. He saw them approach Jerry; one knelt down by him—Donald was not sure if the paramedic touched Jerry at all—then said " 'He's okay,' " got up and left. The paramedics were with Jerry only a very short period of time. Jerry was still face down on the parkway.

In the meantime, Sharon came outside. She saw the paramedics getting ready to leave, about six police officers and a lot of other people standing around. Someone—either a paramedic or a police officer—mentioned drugs and asked her whether Jerry was on drugs and whether he used drugs; she kept telling them no. Donald also was asked whether Jerry was on drugs, and he replied that Jerry did not use drugs.

At some point, Donald and Sharon saw their mother outside sitting on the curb next to Jerry. Donald, who himself was very nervous and excited, saw his mother looking upset and rubbing Jerry. He did not notice her talking to Jerry, but Sharon did, and heard Jerry say he had been beaten up and robbed. She also heard him tell their mother his handcuffs were too tight and ask if she could loosen them; Mrs. Wright asked a police officer about the handcuffs, but he said he could not take them off. While their mother talked to Jerry, Sharon noticed Jerry appeared to keep dozing off. During this time, Donald heard Jerry yell to his mother he wanted some water.

Someone—Donald thought it was either his mother or Sharon—asked a police officer what was wrong or what was going on. The officer turned Jerry over, shined a flashlight in his eyes and said Jerry was on some kind of drugs. According to Sharon, the officer used his foot to turn Jerry over; when he did so, Jerry's head hit the curb. Donald never saw any police

officer use his foot on Jerry or Jerry's head hit the cement. There was foam or mucus or saliva coming out of his mouth and Jerry did not look right: his color was different than normal; Donald noticed his eyes staring out and Sharon noticed they were red and Jerry kept closing them. A woman in the crowd said Jerry was aspirating and a man said something about CPR. The officer near Jerry went to talk to the other officers. When he returned, he said he would take Jerry's handcuffs off because Jerry was not looking well.

Donald heard his mother ask the police if someone could take Jerry to Kaiser; she sent him to their apartment to get Jerry's Kaiser card. Someone also brought Jerry a blanket; it could have been Donald, although he did not remember doing so. The police left Jerry on the ground and did nothing else for him. No one performed CPR. No one brought him any water. According to Donald, the police never told him he could not get water for Jerry and he did not know of them preventing anyone from bringing him water; however, he felt prevented from getting water for Jerry by the presence of the police officers, who would not let him get near Jerry.

After Donald returned from their apartment, a second ambulance with paramedics arrived. They pulled the blanket over Jerry's head and the police told Donald and Sharon to take their mother into their apartment, which they did. They were all upset and crying. They were later joined by Jerry's father and other relatives.

*Ethel Mae Wright*

Jerry's mother, Ethel Mae Wright (Mrs. Wright), was awakened early that morning by Donald knocking on Sharon's window and telling her Jerry had been beaten up. She went outside, saw the paramedics driving away and Jerry lying face down on the grass parkway. A police officer was standing by him and others were standing in the street. She went to Jerry, sat down on the curb by him and put her hand on his neck. He talked to her a little: he said he wanted a drink of water and she told him to hold on a little longer. He also said the handcuffs hurt him and told her to ask the police to remove them; she asked an officer if the handcuffs could be removed or put in front of Jerry, and he said it was standard procedure to put the handcuffs in back. Mrs. Wright could not remember how Jerry's skin felt, and she did not see any bleeding or injuries. As far as she remembered, his voice was normal; she did not notice his breathing.

At one point the police turned Jerry over—Mrs. Wright did not remember how—shined a light in his eyes and told her he was high on drugs. The officer then turned Jerry back over with his foot. Jerry's head almost hit the

curb and Mrs. Wright began screaming; Sharon told her to be quiet. At the time, Jerry's head was limp; it seemed to Mrs. Wright that he had no control over it and could not hold it up. Mrs. Wright felt that Jerry must be cold, so she sent Donald into the apartment to get a blanket.

There was a lady in the crowd who had been coming by and taking Jerry's pulse periodically; she said that Jerry was aspirating. A police officer turned Jerry over, and foam was coming out of his mouth. The officer went to talk to the other officers and did nothing further to Jerry. Sharon suggested they take Jerry to Kaiser; she told the police he had a Kaiser card and they told her she could go get it. Mrs. Wright went to get the card. When she returned, there were other paramedics at the scene. Donald and Sharon met her and said the police had told them to take her back into the apartment, so they took her back. She figured Jerry was dead and started screaming and crying. While she had been outside, the police did not attempt to keep her or the lady who took his pulse away from Jerry; neither did they try to prevent her from getting a blanket for him.

### Jerry Eugene Wright, Sr.

Jerry's father, Jerry Eugene Wright, Sr. (Mr. Wright), received a telephone call from his brother at about 3 or 4 a.m. on May 19, 1979, that Jerry had been beaten up and was dead. He went to 3910 Coco and talked to a police officer who said his son had died of a drug overdose; this was not what he expected to hear, based on what his brother had told him and what he knew about Jerry. He told the officer he did not believe it, and the officer replied that fathers were usually the last ones to know. The officer also told him Jerry had been in an altercation and a little about what had happened. Mr. Wright then went into the family's apartment, numbed by what he had been told. During this time, Jerry's body was still lying on the parkway.

### Officers Robert Saurman and Terry Lovan

Los Angeles Police Department Officers Robert Saurman and Terry Lovan were on patrol in their police vehicle on the morning of May 19, 1979. At approximately 2:30 a.m. they heard several radio calls regarding an incident at 3910 Coco: first, that there was a man screaming for help or a 415 fight (Pen. Code, § 415: fighting in a public place; loud and unreasonable noise; use of offensive words in public), later that there possibly was a gun involved. They proceeded to 3910 Coco where they observed Jerry in the Vega and another man, later identified as Leroy Jones (Jones), in the street. According to Officer Lovan, Jerry was trying to drive away from the curb; the Vega went backward then attempted to move forward, moving

very slowly and never leaving the curb. According to Officer Saurman, the Vega traveled forward 15 or 20 feet into the street, running over Jones's hand or arm, then backed up to its original position in front of 3910 Coco.

The officers stopped their vehicle and got out. According to Officer Lovan, he drew his gun, pointed it at Jerry and ordered him to shut the engine off and get out of the automobile; Jerry did not get out of the automobile and appeared to be incoherent. Officer Saurman went behind the Vega, checked its interior for weapons, said he saw none, then opened the passenger door of the automobile and gently assisted Jerry out; Jerry appeared to need some assistance in getting out of the automobile. Officer Lovan then went over to check on Jones.

According to Officer Saurman, when they got out of their police vehicle, the Vega was still in the middle of the street. He ordered Jerry to raise his hands and stop the automobile; the automobile backed up to the curb. Jerry did not raise his hands, though ordered several times to do so, and remained seated in the Vega. Jerry did not appear to have any difficulty raising his hands or sitting erect. Officer Saurman thought it possible Jerry did not raise his hands because he lacked common sense or was intoxicated; he acknowledged it was also possible Jerry had been beaten so badly he could not respond to the order, but Jerry did not appear to him to be that badly beaten. The officer gently assisted Jerry from the automobile by taking Jerry's arm and pulling Jerry toward him; Jerry appeared to be trying to get out of the automobile but unable to move freely. Once Jerry was out, Officer Saurman placed him on his back on the grass parkway; some time later Jerry was placed on his stomach. About three minutes after he was removed from the automobile, another officer handcuffed Jerry.

Officer Saurman did not hear anyone yelling that Jerry was a victim and had been beaten up, but several times Jerry told him the other man had tried to rob him. He indicated that at some point shortly after he arrived on the scene, he talked to people on the street to see if anyone knew what had happened; several people said Jerry and Jones were in a fight, but no one said anything about a robbery. However, in his report he did not indicate he talked to any witnesses or potential witnesses before the ambulance arrived.

Officer Saurman had Jerry handcuffed because he did not know what had occurred; both Jerry and Jones claimed the other had tried to rob him, so either could be a robbery suspect, and both had been in an altercation. Additionally, Jerry appeared to be intoxicated, under the influence of alcohol or PCP or both. When he helped Jerry from the Vega, Officer Saurman smelled the odor of alcohol on his breath. Also, Jerry had a hard time

controlling his body—his upper body was rigid and muscles tense, and Jerry was unable to move freely—and had difficulty speaking—at times he would speak clearly and at times his words would be slurred, indicating rigidity in his jaw as well. The muscle rigidity and switching from coherent to incoherent speech, as well as Jerry's failure to raise his hands when ordered to do so and difficulty in getting out of his automobile unassisted, indicated possible PCP intoxication.

Once or twice, Officer Saurman heard Jerry say he hurt all over and ask for an ambulance. However, he believed that because Jerry might be under the influence of narcotics this description of how he felt might not be accurate. He never heard Jerry yell or ask for water. He also did not notice Jerry having any trouble breathing.

The officer called for an ambulance, which later arrived. He sat Jerry up for an examination by grabbing his arms from the rear. A paramedic attempted to examine Jerry, but Jerry became agitated and pulled away from the paramedic—the officer was not sure if Jerry was handcuffed then. The paramedic asked if Jerry was injured; he said he hurt all over. The paramedic asked if he had been stabbed or shot; he said he did not know. The paramedic lifted Jerry's shirt and examined him front and back for any obvious trauma, he also looked into his eyes with a flashlight. Officer Saurman did not know if he took Jerry's pulse or blood pressure. However, the paramedic did tell him Jerry was okay to book but should be seen by a doctor prior to booking. The paramedic was with Jerry a couple of minutes, and the ambulance left three to five minutes after it had arrived. At a deposition, Officer Saurman said he did not recall Jerry saying anything to the paramedic other than that he hurt all over and he did not recall the paramedic doing anything to Jerry other than possibly looking in his eyes.

Leaving Jerry on the grass parkway with his hands cuffed behind his back, Officer Saurman went over to Officer Lovan; he returned a minute later. A woman in the crowd identified herself as a nurse and said Jerry was not doing very well. Officer Saurman did not hear anyone say Jerry was aspirating or should be given CPR. He began to pick Jerry up to put him in the police vehicle and noted he was making a gurgling sound and there was foam around his mouth; looked into his eyes with a flashlight and saw they were quite dilated. He thought Jerry was becoming unconscious and something was wrong with him. He laid Jerry on his side, checked his pulse and carotid artery, and either unhandcuffed or rehandcuffed him. He then went to Sergeant Chambers, who had arrived shortly after the officers, told him that Jerry's condition was bad and asked him to request an ambulance, which he did. He returned to Jerry but did nothing further for him. The

second ambulance arrived 10 to 20 minutes later. Officer Saurman did not perform CPR because he did not know the extent of Jerry's injuries and CPR can cause serious injuries if other injuries, such as internal bleeding or back injury, are present; he also did not know what kind of chemicals Jerry had in his body and did not want to endanger his own safety by coming in contact with them. He did not transport Jerry to the hospital himself, again because he did not know the extent of Jerry's injuries and did not want to aggravate them by transporting him in the police vehicle.

Officer Saurman did not recall seeing Mrs. Wright sitting near Jerry or hearing Jerry tell her or anyone else his handcuffs were tight and to ask to have them loosened. He did not recall seeing Sharon there. He recalled a man identifying Jerry as his brother but not whether he talked to the man. He did not recall anyone saying Jerry belonged to Kaiser and suggesting he be taken to Kaiser Hospital.

The officer denied kicking Jerry or using his foot to turn him over, and stated that Jerry's head was never near the curb requiring him to move it with his foot. He denied that Jerry's face ever was in the ground; when Jerry was lying on his stomach, his face was to the side.

While Officer Saurman was attending to Jerry, Officer Lovan attended to Jones, and he was only partially aware of what was happening to Jerry. He was aware Officer Saurman had called the paramedics, who arrived approximately five minutes later. One of the paramedics examined Jones while the other examined Jerry. Officer Lovan saw the one with Jerry but did not recall what he did to him. All he could remember was Jerry saying he hurt all over and the paramedic saying if Jerry was going to be booked he should be examined by a doctor. The paramedics left after three or four minutes.

After the paramedics left, Officer Lovan handcuffed Jones; at some point he saw Jerry had been handcuffed, but he did not know when it had occurred. Officer Lovan then spoke to Officer Saurman and told him that Jones claimed Jerry had attempted to rob him. Sergeant Chambers decided Jerry and Jones were to be transported to the police station; Jerry was considered a possible robbery suspect but was not arrested for being under the influence of narcotics.

Officer Lovan put Jones in the police vehicle then went to keep the crowd away from the parkway. Officer Saurman went to pick up Jerry and put him in the police vehicle. Officer Lovan saw Officer Saurman go to Sergeant Chambers, who then went over and looked at Jerry and requested an addi-

tional ambulance. Officer Lovan also saw foam around Jerry's mouth and noticed Jerry's breathing seemed rapid. This was four to five minutes after the first ambulance left, and a second ambulance arrived five to eight minutes after it was called. The paramedics from the second ambulance examined Jerry and attempted to revive him, but he did not respond and the attempt failed. While waiting for the second ambulance to arrive, Officer Lovan heard a woman say she was a nurse but did not hear her say anything else and did not hear anyone suggest Jerry be given CPR; he did not see anyone do anything else for Jerry.

As a result of directing his attention to Jones, Officer Lovan did not hear Jerry ask for water or tell Officer Saurman he was hurt. He did not hear anyone in the apartment building say not to shoot Jerry, that he was the victim and had been beaten up. Officer Lovan also did not check with anyone else to find out what had happened, and he did not see Officer Saurman do so either.

*Officers Robert James Warden and Nicholas Andrew Titiriga*

Los Angeles Police Department Officers Robert James Warden and Nicholas Andrew Titiriga were on patrol in their police vehicle at approximately 2:30 a.m. on May 19, 1979, when they received several radio transmissions regarding a man screaming or yelling for help, a 415, and a man with a gun at 3910 Coco. They drove to the location and arrived just after Officers Saurman and Lovan. They saw Officer Saurman talking to Jerry, who was in the Vega, Officer Lovan standing in front of the Vega and Jones in the street.

Officer Warden heard Officer Saurman order Jerry several times to raise his hands and exit the automobile, but Jerry did not comply. Officer Warden moved to a location from which he could cover the automobile and Officer Saurman, and saw Officer Saurman assist Jerry out of the automobile; he did not see Jerry fall onto the parkway. He went to the parkway where Jerry was lying and noted that Jerry appeared to be under the influence of drugs, possibly PCP; this conclusion was based on Jerry's upper muscle rigidity and the appearance of his eyes. He handcuffed Jerry's hands behind his back and also asked Jerry if he hurt; Jerry said he did. Either before or after Jerry was handcuffed, he was lying chest down but was rolled onto his back at some point; Officer Warden did not see Officer Saurman use his foot to roll Jerry over. Officer Warden then left Jerry.

Officer Titiriga went over to Jones after exiting the police vehicle and concentrated his attention on Jones. He did see Officer Saurman assist Jerry

from the Vega, then Jerry lying chest down on the parkway with his hands cuffed behind him. According to his deposition testimony, he heard Officer Saurman ask Jerry if Jones robbed him or beat him up.

Sergeant Chambers arrived shortly after Officers Warden and Titiriga. Officer Warden went over to speak to him after he left Jerry and told him what was happening. Some or all of the officers present decided to arrest Jerry and Jones on a 415 and Jerry on a 647f (Pen. Code, § 647, subd. (f): disorderly conduct—public intoxication). Sergeant Chambers instructed the officers to arrest them.

Then the paramedics arrived. Officer Warden could not remember if Jerry was handcuffed when the paramedic examined him. The officer did not believe he spoke to the paramedics. Several minutes—or in a matter of seconds, according to Officer Warden's deposition—after the paramedics left, he noticed Jerry seemed to have stopped breathing and he appeared very pale. Officer Warden took Jerry's handcuffs off, made sure he was face up, and requested a second ambulance, which did not arrive until 15 or 20 minutes later. Meanwhile, one of the officers, it might even have been him, suggested taking Jerry to the hospital; however, Officer Warden made no note of the suggestion in his report prepared right after the incident took place.

Officer Warden recalled seeing Mrs. Wright sitting near Jerry after the first paramedics left; he did not recall seeing Donald or Sharon at the scene. She did not ask him to loosen Jerry's handcuffs, but she might have asked that Jerry be given some water. He did not recall hearing Jerry ask for water or hearing anyone say Jerry was aspirating or identify herself as a nurse. Officer Titiriga did not hear anyone identify herself as a nurse, say Jerry was aspirating or say anything about CPR. He did, however, hear Jerry complain he hurt all over.

*Sergeant William Michael Chambers*

Los Angeles Police Department Sergeant William Michael Chambers also heard the radio transmissions at about 2:30 a.m. on May 19, 1979, regarding the incident at 3910 Coco; he heard a patrol vehicle respond and decided to respond himself and observe the activity at the scene. When he arrived, two police vehicles and the four officers were there. Jerry already was lying on the parkway; Sergeant Chambers did not recall him being handcuffed at that time. The sergeant smelled alcohol on Jerry's breath and noticed his speech was slurred and he had some upper body rigidity, but the sergeant did not see any visible injuries and Jerry did not appear to him to

be having any medical difficulties. Sergeant Chambers spoke to both Jerry and Jones; each said the other robbed and beat him. After speaking to them, he spoke to the officers and told them to place Jerry under arrest for being under the influence.

The paramedics arrived seven to eight minutes after he did. They indicated Jerry could be booked but should receive medical treatment. Three to five minutes after they left, Officer Saurman told him Jerry was foaming at the mouth, breathing shallowly and almost unconscious; Jerry was unhandcuffed, and Sergeant Chambers or one of the officers called for another ambulance. When the ambulance did not arrive, he checked with communications and was informed one was on the way. During this time, Sergeant Chambers did not hear anyone identify herself as a nurse or say Jerry should be given CPR. He did not have the officers transport Jerry to the hospital themselves; doing so would not fit within established guidelines, in that an ambulance was responding and he was not sure that moving Jerry in the police vehicle would not cause additional problems. He did not perform or have performed CPR on Jerry because Jerry was still breathing and he did not know the cause of Jerry's difficulties.

The sergeant recalled seeing Mrs. Wright and other family members after Jerry started foaming at the mouth, but he did not recall Mrs. Wright yelling for something to be done for her son or asking for Jerry's handcuffs to be removed because they were too tight. Sergeant Chambers did not recall hearing Jerry ask for water.

*Paramedic Daniel Maloney*

Daniel Maloney (Maloney) is a paramedic with the Los Angeles City Fire Department and was the first paramedic to examine Jerry. In his ambulance, he carried a number of items of medical equipment, including a sphygmomanometer, or blood pressure cuff, oxygen, IV's, various drugs, and devices for respiration. The vehicle also was equipped with a radio which could put him in contact with a base hospital; he would contact the base hospital when he judged a patient would benefit by medical intervention which required hospital permission to perform; this judgment would be based on the symptoms observed in the person he was examining.

As a paramedic, Maloney was not trained to deal with diseases specifically but with symptoms or signs of certain diseases; these symptoms could be revealed by taking a person's blood pressure or pulse, checking respiration or palpating for injuries. He was taught to recognize the symptoms of shock, which are a decreased level of consciousness, change in skin color—it could be pale or have a bluish hue in certain areas, indicating it

was not getting enough oxygen—skin temperature, moisture or lack of moisture on the skin, thready pulse, and blood pressure of 90 or less. His response to these symptoms would be to try to ascertain the reason for shock by asking questions and getting a history and to treat the shock; he would call the base hospital and generally transport the person to a hospital. If necessary, he could use such medical aids as an IV or oxygen. He acknowledged he probably could not tell if someone was in shock without taking the person's pulse and blood pressure, palpating, feeling the skin and determining if the person was oriented.

On May 19, 1979, he received a call at 2:39 a.m. to go to 3910 Coco; he arrived at 2:45 and left at 2:50. When he arrived, he saw the police vehicles and officers, and Jones lying in the street. A police officer told him there was a gentleman lying on the parkway who needed to be looked at; he went over to Jerry while his partner went to see Jones. Maloney did not recall any further conversation with the officer, although it would have been normal to ask why they had been called to the scene. He did not recall being told Jerry had been complaining of pain or that he hurt all over and had asked for an ambulance. He knew Jerry and Jones had been in a fight—although he did not remember who told him that—and assumed that was why the paramedics had been called, so he did not ask the police why they had been called.

When he approached him, Jerry was lying on his back or side with his hands cuffed behind him. Maloney asked him what was wrong or what had happened; Jerry did not respond. Maloney repeated the question at least one more time to try to get a response. He also asked Jerry if he was hurt, and Jerry said he was not hurt; he did not complain he hurt all over. Maloney did not ask Jerry a series of orientation questions. While he was talking to Jerry, he was examining him visually to determine why the paramedics had been called to the scene. He then gave Jerry what is called the 60-second examination, a brief, visual examination of the body to determine if there is a life-threatening situation. He could not recall whether he had a flashlight with him which he might have used for the examination. This was the only examination he gave; he did not take Jerry's pulse or blood pressure. He did not recall if he touched Jerry's skin, although he could have done so while examining Jerry's body for visible injuries. After the 60-second examination, he told a police officer if Jerry was to be booked he probably should see a doctor prior to booking; then he left. While he was with Jerry, he did not smell alcohol on Jerry's breath.

Maloney did not call the base hospital regarding Jerry because he saw no symptoms indicating such a call was necessary. Specifically, he saw no shock symptoms. He saw no decreased consciousness—Jerry was aware he was there and understood his questions, looked at him when he talked to

Jerry, and, when Jerry did respond to him, his answers were appropriate though somewhat hostile. Jerry's eyes did not look abnormal, Maloney did not notice anything abnormal about Jerry's breathing, and Maloney did not make any note that Jerry's skin temperature was abnormal or the skin seemed moist. Moreover, Maloney did not see a medical alert tag and no one ever told him Jerry had sickle cell trait.

*Nurse Karen Jones*

Karen Jones (Nurse Jones) is the director of the Emergency Medical Service Training Office of the University of California Medical Center in San Diego; she has a bachelor of science degree in health service and is a registered nurse; she has written on the subject of paramedics, been involved with professional committees dealing with paramedics, and ridden with and evaluated paramedics; she is familiar with the standards of care for paramedics. She described the symptoms of shock as follows: in the early stages, the patient's pulse and respiratory rates may go up slightly, the patient may become a little confused or anxious or complain of thirst; as shock progresses, the pulse and respiratory rates increase, blood pressure begins to fall, the patient's level of consciousness deteriorates and the patient may be combative, restless or unconscious; the patient's skin is pale and becomes cold, clammy and sweaty. A paramedic's treatment for shock would be to give the patient oxygen and fluids, monitor the patient's heart, put blankets on the patient and transport him to the hospital.

In her view, if paramedics called to a location see three police vehicles, five police officers, and two patients lying on the ground, the first thing they should do is go to the police officers and find out why, specifically, they were called, asking whether the patients had voiced any complaints and how the patients had ended up where they did. Failure to do this would fall below the standard of care for a paramedic. The next thing they should do would be to go to the patient, check for a pulse and make sure the patient was breathing without obstruction.

Nurse Jones also opined, if a paramedic went to a patient, asked how the patient was and the patient did not respond, asked a second and a third time before the patient said he was okay, the paramedic should question him further to find out why the paramedic was called to the scene and should ask some orientation questions to determine whether or not the patient was thinking clearly. If the paramedic does not do this and knows only that a beating or fight occurred, the paramedic should take the patient's pulse; a fast pulse could indicate shock, which could indicate the patient was not thinking clearly. Failure to do this would fall below a paramedic's standard of care.

Additionally, according to Nurse Jones, if paramedics are called to the scene of a fight and do not ask any questions, they should examine the patient for such things as shock from internal injuries, possible head injury or trauma, internal injuries and broken bones. They should palpate for injuries, touching the body from head to toe, to check for cuts, bumps, bruises, obvious deformities or pain. Failure to do this would fall below the standard of care. They should take the patient's blood pressure. They also should check for paleness of skin; if the patient is black and the examination is being conducted at night away from a light source, the paramedics would need a flashlight and should check for paleness by looking at mucous membranes inside the patient's lip or pressing the patient's nail bed to see if the patient has good capillary refill. They should do this test to check for shock or bleeding. When performing the foregoing examination, the paramedics would be able to feel the patient's skin, and the paramedics should also feel the patient's chest or forehead for skin moisture, which is an early sign of shock. If the paramedics did not touch the patient's skin to check for moisture their examination would fall below the standard of care. After hearing a description of Maloney's examination of Jerry, Nurse Jones was of the opinion his examination fell below the standard of care for a paramedic.

*Dr. Barry Freed Silverman*

Dr. Barry Freed Silverman is board certified in clinical and anatomic pathology, is a staff pathologist at the Sepulveda Veteran's Administration Hospital, worked for the Los Angeles County Coroner's Office for approximately 12 years and teaches pathology in the medical school at the University of California at Los Angeles. He was asked by plaintiffs to render an opinion as to the cause of Jerry's death and whether the actions or inaction of the police officers and paramedics were a substantial cause of his death. Dr. Silverman was provided with Jerry's autopsy report. It ascribed Jerry's death to massive intravascular sickling due to massive sickle cell disorder; Dr. Silverman agreed and confirmed his diagnosis by reviewing the report.

The report indicated an autopsy was performed and no cause of death was revealed by an examination of the body; sections of the organs were then taken for microscopic and toxicological study. The toxicological study found no alcohol, PCP or other drugs in the body. The microscopic study revealed massive intravascular sickling of essentially every red sickle cell present on the slides from every organ sampled.

Dr. Silverman explained sickle cell disease is an inherited genetic disease affecting the hemoglobin, which is found in the red blood cells and supplies oxygen to the tissues in the body. A person can get the gene from one or

both parents; a person receiving the gene from only one parent is said to have sickle cell trait, a less serious form of the disease. A person with sickle cell trait may have a normal lifespan and never even know he or she has the disease. In fact, it is rare for a person with only sickle cell trait to die from the disease.

A person with sickle cell disease can have problems when he or she lacks oxygen; the person can go into sickle cell crisis, which is usually manifested by severe pain and anemia, and which can cause shortness of breath, shock and death. Sickle cell crisis can be caused by stress, which causes the organs to require more oxygen. Sickle cell crisis also can occur when a person is in shock, which is a circulatory failure; the symptoms of shock are pale skin, weakness, fast and thready pulse, low blood pressure, cool and clammy skin and dehydration. It would be consistent with shock or sickle cell crisis for a person to request water or a blanket, have trouble breathing, have trouble keeping the eyes open or be semiconscious. It would be consistent with sickle cell crisis to complain of pain all over.

The autopsy report indicated Jerry's sickle cell disorder was precipitated by a continual stressful condition experienced prior to his death; Dr. Silverman agreed, as did other doctors who examined the coroner's findings. In Dr. Silverman's opinion, Jerry could have been stressed and suffered depleted oxygen by the attempted robbery, the beating, and being ordered from his automobile at gunpoint by police, placed face down on the parkway and handcuffed. Additionally, lying chest down with his hands cuffed behind his back would have made it more difficult to breathe by impeding the movement of the organs in his abdomen and would have caused his condition to worsen. The doctor added that psychological stress as well as physical stress can contribute to sickle cell crisis, since it can cause difficulty breathing and depletion of oxygen and decrease the blood flow.

The treatment for sickle cell crisis caused by lack of oxygen in a person with sickle cell trait and for shock is the same—oxygen and fluids. In a person with sickle cell crisis, the oxygen and fluids cause the sickled cells to return to their normal shape, allowing the blood to flow and deliver oxygen to the tissues. In Dr. Silverman's opinion, had Jerry been given oxygen and fluids his life would have been saved.

If a paramedic examined a person with sickle cell crisis and checked only pulse and blood pressure, the paramedic would find a fast, maybe thready pulse and low blood pressure. The paramedic would give the person oxygen and start an intravenous drip; this would reverse both the shock and the sickle cell crisis. Dr. Silverman opined if this had been done for Jerry he would have lived, and the failure to do this was a substantial cause of Jerry's death.

When asked what could have caused mucous to come out of Jerry's mouth at some point, Dr. Silverman indicated it probably was pulmonary edema—fluid in the lungs caused by damage to the lungs; this can be caused by shock and sickling crisis. If so, CPR would have helped at that time.

### Dr. Laurence Heifetz

Dr. Laurence Heifetz practices internal medicine, hematology—dealing with blood disorders, including sickle cell disease—and oncology—dealing with cancer. He is a clinical professor at the University of California at Los Angeles medical school in hematology and oncology and is board certified in internal medicine and medical oncology. In both training and practice he has treated persons with sickle cell disease and trait and has witnessed persons with sickle cell disease undergoing sickling crisis. However, he has no experience in pathology or in determining the cause of death in patients other than his own.

According to Dr. Heifetz, it is extremely rare for a person with sickle cell trait only to go into sickle cell crisis and it would require a tremendous amount of stress or lack of oxygen to precipitate a crisis in a person with the trait only. He had read Jerry's autopsy report and disagreed with it; while he did not know what caused Jerry's death, he was certain it was not caused by sickling. He pointed out red blood cells continue sickling after death, when there is no oxygen in the body, and it is absolutely common to see sickled cells after death in the body of a person with sickle cell trait.

After hearing a description of the events leading up to Jerry's death, Dr. Heifetz opined Jerry was not going through sickling crisis at that time: sickling crisis has a standard pattern; it takes a few hours to come on and starts with severe pain, which was not the case here. He also could not see how the police officers' actions could have been a substantial factor in causing Jerry's death, since they did not constitute the massive insult to the body necessary to cause the cells to sickle.

According to Dr. Heifetz, psychological stress cannot cause sickling; the stress needed is the type that can cause blood pressure to fall and body chemistry to change. He did acknowledge, however, that psychological stress may cause the body to require more oxygen and may enhance difficulties brought on by other kinds of stress. He also noted lying face down with one's hands cuffed behind one's back could enhance such difficulties.

### Damages

Jerry's family described him as a nice and a good boy, industrious and hardworking, quiet, affectionate. He helped with household expenses, pay-

ing $75 a month for rent and $70 a month toward the family's automobile payment, and helped with household chores, such as cooking and cleaning. He was very close to both his brother and sister; they confided in one another and spent time together. He was always thinking of his mother and demonstrating concern for her well-being.

Jerry had worked since he was six or seven years old. Mr. Wright owned Wright Properties, which handled real estate, taxes, property management, and property maintenance. As a child, Jerry helped his father with apartment maintenance on weekends.

Although Jerry had dropped out of high school, he later got his GED and went on to Sawyer College and Associated Technical College, where he studied accounting, bookkeeping, English, word processing, and management. He helped at his father's office with tax consultations, and his father hoped he would eventually come to work at the office. At the time of his death, Jerry was a supervisor in the word processing department at Security Pacific National Bank; he had worked there less than a year. Before that, while he was in school, he had held a number of other jobs.

Two weeks after Jerry's death, his mother, brother, and sister moved from the apartment at 3910 Coco they had shared with him; they had difficulty sleeping there and walking past the spot where Jerry had died. All three of them still thought about him or dreamed about him. Donald sometimes had nightmares and was unable to sleep; Sharon cried a lot over him.

Mr. Wright had difficulty sleeping and working after Jerry's death. He still felt pain and depression over the loss.

## CONTENTIONS

### I

Plaintiffs contend the trial court erred in: granting defendants' motion for JNOV; granting defendants' motion for nonsuit on the civil rights actions; granting a new trial; requiring plaintiffs to prove gross negligence; and instructing the jury Jerry's arrest was permissible as a matter of law.

### II

Defendants contend the judgments for plaintiffs should be reversed, in that: damages were excessive; there were instructional errors on negligence

and negligent infliction of emotional distress; and the evidence is not sufficient to support them.

DISCUSSION

*On Appeal*

I

FIRST CAUSE OF ACTION: WRONGFUL DEATH—NEGLIGENCE

██ When presented with a motion for JNOV, the trial court "cannot weigh the evidence [citation], or judge the credibility of witnesses. [Citation.] If the evidence is conflicting or if several reasonable inferences may be drawn, the motion for judgment notwithstanding the verdict should be denied. [Citations.] 'A motion for judgment notwithstanding the verdict of a jury may properly be granted only if it appears from the evidence, viewed in the light most favorable to the party securing the verdict, that there is no substantial evidence to support the verdict. If there is any substantial evidence, or reasonable inferences to be drawn therefrom in support of the verdict, the motion should be denied.' [Citation.]" (*Hauter* v. *Zogarts* (1975) 14 Cal.3d 104, 110 [120 Cal.Rptr. 681, 534 P.2d 377, 74 A.L.R.3d 1282].) The same standard of review applies to the appellate court in reviewing the trial court's granting of the motion. (*Henrioulle* v. *Marin Ventures, Inc.* (1978) 20 Cal.3d 512, 515 [143 Cal.Rptr. 247, 573 P.2d 465]; *Hauter, supra,* at p. 111.) Accordingly, the evidence set forth at length above must be viewed in the light most favorable to the jury's verdict, resolving all conflicts and drawing all inferences in favor of that verdict.

██ The jury here was instructed: "It is the duty of one who undertakes to perform the services of a police officer or paramedic to have the knowledge and skills ordinarily possessed and to exercise the care and skill ordinarily used in like cases by police officers or paramedics in the same or similar locality and under similar circumstances. A failure to perform such duty is negligence. [¶] The standard to be applied in this case is gross negligence. The term gross negligence means the failure to provide even scant care or an extreme departure from the ordinary standard of conduct.

"In performing professional services for a client, a paramedic has the duty to have that degree of learning and skill ordinarily possessed by reputable paramedics practicing in the same or similar locality and under similar circumstances. [¶] It is his further duty to use the care and skill ordinarily used in like cases by reputable members of his profession practicing in the

same or a similar locality under similar circumstances and to use reasonable diligence and his best judgment in the exercise of his professional skill and in the application of his learning in an effort to accomplish the purpose for which he was employed. A failure to perform any such duty is negligence.

"A police officer or a paramedic who rendered emergency medical services at the scene of an emergency shall only be liable in civil damages for acts or omissions performed in a grossly negligent manner or acts or omissions performed in bad faith. [¶] Emergency medical services includes but is not limited to first aid and medical services, rescue procedures and transportation or other related activities necessary to ensure the health or safety of a person in imminent peril."

The foregoing instructions comport with Health and Safety Code section 1799.106 which provides a police officer or paramedic "who renders emergency medical services at the scene of an emergency shall only be liable in civil damages for acts or omissions performed in a grossly negligent manner or . . . not performed in good faith."[1]

On the first cause of action for wrongful death resulting from negligence, the jury found in favor of plaintiffs Mr. and Mrs. Wright and against Saurman, Maloney and the City of Los Angeles. In granting defendants' motion for JNOV, the trial court found "there was a dispute in the evidence about the cause of death of the decedent Jerry Wright, Jr. Nevertheless accepting plaintiffs' medical evidence that death occurred as a result of a sickle cell crisis by reason of a sickle cell anemia condition or trait, there is no evidence that a Los Angeles police officer in this case knew or should have known the symptomology of such condition, or that at the time paramedic Maloney earlier examined the decedent Jerry Wright, Jr. that paramedic Maloney should have foreseen a sickle cell crisis." The trial court also found "there was a dispute in the evidence about whether the decedent Jerry Wright, Jr. made a request for water. Nevertheless, accepting plaintiffs' version that such a request was made, there is no evidence that plaintiff's mother, who was with decedent Jerry Wright, Jr. at all times from shortly after the departure of the first paramedic unit, could not have procured or caused water to be procured—as she did with respect to obtaining a blanket."

■ The elements of actionable negligence are a duty to use due care and a breach of that duty which proximately causes the plaintiff's injuries. (*Musgrove* v. *Ambrose Properties* (1978) 87 Cal.App.3d 44, 53 [150

---

[1] Section 1799.106 contains the substance of former section 1769 (repealed Stats. 1983, ch. 1246, § 5), in effect at the time of Jerry's death.

Cal.Rptr. 722].) ■ The question of duty, whether it exists and its scope, is one of law for the court. (*Ballard* v. *Uribe* (1986) 41 Cal.3d 564, 572, fn. 6 [224 Cal.Rptr. 664, 715 P.2d 624].) Duty is " ' "an expression of the sum total of those considerations of policy which lead the law to say that the particular plaintiff is entitled to protection." ' " (*Ibid.*) The considerations which go into the formulation of a duty include the foreseeability of harm to the plaintiff, the degree of certainty the plaintiff suffered injury, the closeness of the connection between the plaintiff's injury and the defendant's conduct, the moral blame attached to the defendant's conduct, a policy of preventing future harm, the extent of the burden which would be placed on the defendant, the consequences to the community of imposing the duty, and the availability, cost and prevalence of insurance for the risk involved. (*Id.* at pp. 572-573, fn. 6.)

■ The chief element in determining whether a duty should be imposed is the foreseeability of the risk. (*Dillon* v. *Legg* (1968) 68 Cal.2d 728, 739, 740 [69 Cal.Rptr. 72, 441 P.2d 912, 29 A.L.R.3d 1316].) However, the question before the court is not whether the plaintiff's particular injury was reasonably foreseeable in light of the defendant's particular conduct; rather, it is whether the type of negligent conduct at issue is sufficiently likely to result in the type of harm experienced to justify the imposition of liability. (*Ballard* v. *Uribe, supra,* 41 Cal.3d at p. 573, fn. 6.) Thus, it is not necessary that the exact means or type of injury be foreseeable; it is only necessary that the general character or type of harm or injury be reasonably foreseeable. (*Bigbee* v. *Pacific Tel. & Tel. Co.* (1983) 34 Cal.3d 49, 57-58 [192 Cal.Rptr. 857, 665 P.2d 947]; *Dailey* v. *Los Angeles Unified Sch. Dist.* (1970) 2 Cal.3d 741, 751 [87 Cal.Rptr. 376, 470 P.2d 360]; *McKenzie* v. *Pacific Gas & Elec. Co.* (1962) 200 Cal.App.2d 731, 738 [19 Cal.Rptr. 628], disapproved on other grounds in *Di Mare* v. *Cresci* (1962) 58 Cal.2d 292, 299 [23 Cal.Rptr. 772, 373 P.2d 860].) Once the court determines that the duty exists, using the foregoing standards, then the jury must determine whether the particular injury suffered by the plaintiff was reasonably foreseeable in light of the particular conduct by the defendant. (*Ballard, supra,* at p. 573, fn. 6.)

■ Here, a basic duty was established for Maloney—to provide his medical services in a manner which was not grossly negligent or performed in bad faith. (Health & Saf. Code, § 1799.106.) His testimony and the testimony of Nurse Jones established the type of medical services which should be provided to fulfill this duty. According to Nurse Jones, paramedics called to a location where the police are present and the patient is on the ground should question the police or the patient to find out why they were called and whether the patient had voiced any complaints. If the patient did not respond immediately to the paramedics' questions but had to be asked

several times, the paramedics should ask some orientation questions to determine whether or not the patient was thinking clearly; unclear thinking could be a symptom of shock.

Nurse Jones stated that if paramedics know there has been a fight and do not ask questions, they should examine the patient for the possibility of shock caused by internal injuries, possible head injury or trauma, internal injuries or broken bones. Such an examination would include palpation and visual examination of the body, taking blood pressure, checking the skin for paleness or moisture. She pointed out that if the patient was Black and there was not a lot of light at the location, the check for paleness of the skin would require looking at the mucous membranes inside the patient's lip or pressing the patient's nail bed to see if the patient has good capillary refill. If symptoms of shock were present, the paramedics should cover the patient, administer oxygen and fluids and transport the patient to a hospital.

Maloney indicated he was trained to deal with symptoms or signs of various diseases, among them, shock. If it appeared from the symptoms the patient required medical treatment beyond that which he was able or authorized to perform, he was to contact a base hospital or transport the patient to a hospital. He acknowledged he probably could not tell if a patient was in shock without asking questions to determine whether the patient was oriented, taking the patient's pulse and blood pressure, palpating and feeling the patient's skin.

The foregoing evidence supports the conclusion that paramedics arriving at a location where there has been a fight and finding a patient lying on the ground have the duty to make an examination which is sufficient to determine whether the patient has symptoms of any serious injuries which may likely result from a fight, such as shock, head injury or trauma, internal injuries or broken bones, and to treat those symptoms or take the patient to a hospital for treatment of the injury. It is reasonably foreseeable that failure to perform an examination sufficient to determine whether the symptoms of a serious injury are present could result in the failure to ascertain that a serious injury may exist and to treat or obtain treatment for that serious injury, which could result in further injury or death. (See The Merck Manual (14th ed. 1982) § 3, ch. 24, p. 407 ["Untreated, shock is usually fatal"].)

It is not necessary that the information available to the paramedics make a particular risk foreseeable, e.g., a risk of death from shock, from sickle cell crisis, from internal bleeding or from any other particular type of injury or disease. Paramedics do not necessarily deal with causes; they deal with symptoms. It is only necessary that the paramedics recognize the types of

symptoms which it is reasonably foreseeable could result in serious injury or death and treat or get treatment for those symptoms. (See *Bigbee* v. *Pacific Tel. & Tel. Co., supra,* 34 Cal.3d at pp. 57-58; *Dailey* v. *Los Angeles Unified Sch. Dist., supra,* 2 Cal.3d at p. 751; *McKenzie* v. *Pacific Gas & Elec. Co., supra,* 200 Cal.App.2d at p. 738.) As Dr. Silverman testified, some of the symptoms of sickle cell crisis are the same as symptoms of shock. The paramedics' treatment of these symptoms by providing oxygen and fluids would be appropriate and could save the patient's life no matter which problem caused the symptoms.

The question then becomes whether substantial evidence supports the jury's conclusion Maloney breached his duty and his breach constituted gross negligence, i.e., his actions or omissions did not provide even scant care or were an extreme departure from the ordinary standard of conduct. (*Kearl* v. *Board of Medical Quality Assurance* (1986) 189 Cal.App.3d 1040, 1052 [236 Cal.Rptr. 526].) According to Maloney's testimony, he did not question the police officers at the scene to determine why, specifically, he had been called to examine Jerry; all he knew was that Jerry had been in a fight. He asked Jerry what was wrong or what had happened several times before Jerry responded, but he did not ask any orientation questions to determine whether Jerry was thinking clearly. He did not check Jerry's pulse or blood pressure, feel his skin for moisture, palpate him for injuries, check his mucous membranes for paleness or his nail bed for capillary refill. All he did was perform a visual examination for visible, external injuries or symptoms which, according to his own testimony, was insufficient to determine whether Jerry was in shock. Accordingly, there is substantial evidence to support the conclusion Maloney's treatment of Jerry was grossly negligent, i.e., he failed to provide Jerry with even a scant amount of care and his conduct was an extreme departure from the standard of care for a paramedic in such a situation.

If there is also substantial evidence to support the jury's conclusion Maloney's grossly negligent examination and failure to treat Jerry proximately caused Jerry's death, the trial court erred in granting judgment notwithstanding the verdict against Maloney and the City of Los Angeles, his employer, on the first cause of action. As the jury was instructed, an injury is proximately caused by negligent conduct if the conduct is a substantial factor in bringing about the injury. (See, e.g., *Fein* v. *Permanente Medical Group* (1985) 38 Cal.3d 137, 152 [211 Cal.Rptr. 368, 695 P.2d 665].) ■ Where a medical care provider negligently fails to perform diagnostic procedures indicated by the patient's condition and thus fails to properly diagnose and treat the patient, and the patient's resulting injuries are more extensive or severe than they would have been had prompt diagnosis and treatment been given, the medical care provider's negligence is a substantial

factor in bringing about the injuries and a proximate cause thereof. (See *ibid.*; *Wickline* v. *State of California* (1986) 192 Cal.App.3d 1630, 1645 [239 Cal.Rptr. 810]; *Cullum* v. *Seifer* (1969) 1 Cal.App.3d 20, 24-28 [81 Cal.Rptr. 381], disapproved on other grounds in *Scala* v. *Jerry Witt & Sons, Inc.* (1970) 3 Cal.3d 359, 364 & fn. 1 [90 Cal.Rptr. 592, 475 P.2d 864].)

■ Here, Dr. Silverman testified if a paramedic checked the pulse and blood pressure of a person in sickle cell crisis, the paramedic would find a fast, maybe thready pulse and low blood pressure, which are also symptoms of shock; the paramedic would initiate treatment for shock, oxygen and an IV, which is also the treatment for sickle cell crisis. In his opinion, had this been done for Jerry, he would have lived, and the failure to do it was a substantial cause of Jerry's death. This evidence clearly supports a conclusion Maloney's gross negligence in treating Jerry proximately caused his death: had Maloney done the indicated tests, he would have discovered the symptoms of shock, administered the appropriate treatment and transported Jerry to the hospital, and Jerry would have lived.

The trial court made much of the fact none of Jerry's family members brought him any water, although they heard him request it. Even if this could be considered negligence and a proximate cause of his death, it would not absolve Maloney and the City of Los Angeles of liability for Maloney's gross negligence. ■ There may be more than one proximate cause of an injury, and each defendant is liable for all damage of which his negligence is *a* proximate cause. (*American Motorcycle Assn.* v. *Superior Court* (1978) 20 Cal.3d 578, 586 [146 Cal.Rptr. 182, 578 P.2d 899]; *Harris* v. *City of Compton* (1985) 172 Cal.App.3d 1, 10 [217 Cal.Rptr. 884].) ■ More specifically, where a person is injured and the defendant's negligent treatment of that person is a proximate cause of his subsequent death, the failure of others to protect the person from harm is not a superseding cause of death which protects the defendant from liability, but it is merely a concurrent cause. (See *Fish* v. *Los Angeles Dodgers Baseball Club* (1976) 56 Cal.App.3d 620, 634-639 [128 Cal.Rptr. 807, 91 A.L.R.3d 1].) ■ Accordingly, there is substantial evidence to support the jury's verdict against Maloney and the City of Los Angeles on plaintiffs' first cause of action for wrongful death, and the trial court erred in granting judgment notwithstanding that verdict.

■ As to Officer Saurman, plaintiffs contend he should be held liable by virtue of his actions which created additional stress for Jerry and contributed to his death, i.e., pulling him out of his automobile, handcuffing him face down on the parkway, kicking him and poking him with a baton. The problem with plaintiffs' position is that the jury found in favor of Officer

Saurman on plaintiffs' causes of action for wrongful death resulting from false imprisonment and battery. The jury having found Officer Saurman did not falsely imprison or batter Jerry, there does not appear to be any factual basis upon which to impose liability. Accordingly, the trial court properly granted the JNOV on plaintiffs' first cause of action as to Officer Saurman.

## II

### Sixth Cause of Action: Negligent Infliction of Emotional Distress

The sixth cause of action was brought by plaintiffs Mrs. Wright, Donald and Sharon Wright only and based on the "bystander" theory of liability, enunciated in *Dillon* v. *Legg, supra,* 68 Cal.2d 728. *Dillon* involved a mother and sister who witnessed the victim being struck by an automobile negligently operated by defendant. (At p. 731.) The court held a close relative who witnesses the negligent infliction of injury or death on the victim may recover for his or her own resulting emotional trauma and physical injury. (*Id.* at p. 740.) ▇▇▇ *Dillon* presented three factors for consideration in determining whether the defendant owes a duty of care to the relative and thus may be held liable: whether the plaintiff is located near the scene of the accident, whether the plaintiff's shock resulted directly from a sensory and contemporaneous observance of the accident, and whether the plaintiff and victim are closely related. (*Id.* at pp. 740-741.) The court found all three factors present in the case before it. (*Id.* at p. 741.)

▇▇▇ In the instant case, defendants appear to concede the first and third factors are present but deny the presence of the second factor, contemporaneous observation. The facts show Donald observed Maloney's "examination" of Jerry, but Mrs. Wright and Sharon arrived as the paramedics were leaving. All three observed the subsequent decline of Jerry's physical condition and his suffering. Plaintiffs contend this is sufficient to meet the contemporaneous observation factor of *Dillon,* citing subsequent cases which broadened that factor to include the situation where the relative arrives on the scene just after the negligent act and observes the results of that act. (See *Archibald* v. *Braverman* (1969) 275 Cal.App.2d 253 [79 Cal.Rptr. 723], approved by *Krouse* v. *Graham* (1977) 19 Cal.3d 59, 76 [137 Cal.Rptr. 863, 562 P.2d 1022] and *Ochoa* v. *Superior Court* (1985) 39 Cal.3d 159, 168-170 [216 Cal.Rptr. 661, 703 P.2d 1]; see also *Nazaroff* v. *Superior Court* (1978) 80 Cal.App.3d 553 [145 Cal.Rptr. 657], also approved by *Ochoa, supra*, at pp. 168-170.)

Recently, however, concern over the expansion of *Dillon* and the continuing uncertainty as to the scope of an action for negligent infliction of emo-

tional distress led the Supreme Court to reconsider the guidelines set forth in *Dillon*. ■ In *Thing* v. *La Chusa* (1989) 48 Cal.3d 644 [257 Cal.Rptr. 865, 771 P.2d 814] the court clarified those guidelines by holding "a plaintiff may recover damages for emotional distress caused by observing the negligently inflicted injury of a third person if, but only if, said plaintiff: (1) is closely related to the injury victim; (2) is present at the scene of the injury-producing event at the time it occurs and is then aware that it is causing injury to the victim; and (3) as a result suffers severe emotional distress—a reaction beyond that which would be anticipated in a disinterested witness and which is not an abnormal response to the circumstances." (At pp. 667-668, fns. omitted.)

■ Once the second factor is so clarified, it is clear none of the three plaintiffs who brought the sixth cause of action for negligent infliction of emotional distress on the bystander theory was entitled to a verdict thereon. Donald was the only one present at the scene at the time the injury-producing event occurred, and he presented no evidence he was *then* aware Jerry was being injured by Maloney's negligent conduct. Consequently, the trial court did not err in granting judgment notwithstanding the verdict as to the sixth cause of action.

## III

### Nonsuits on Civil Rights Causes of Action

■ Plaintiffs first argue that defendants never moved for a nonsuit pursuant to Code of Civil Procedure section 581c, subdivision (a). Even if a trial court cannot dismiss pursuant to a nonsuit on its own motion, the transcript nevertheless reflects that after plaintiffs rested, defense counsel brought "some motions for nonsuit or partial nonsuit under C.C.P. 581c in that several of these causes of action I don't believe there is sufficient evidence to go to the jury on." [*Sic.*] Defense counsel then acknowledged the correctness of the trial court's statement that defendants were claiming that plaintiffs restated the same series of events in several legal theories. Defense counsel proceeded to explore various allegations and causes of action in the complaint. Since the civil rights causes of actions later dismissed were based on Jerry's arrest which, as we discuss *post*, was proper, we see no merit, procedural or otherwise, to this aspect of plaintiff's claim on appeal.

■ Plaintiffs next argue that the trial court erroneously granted nonsuit on civil rights causes of action based on 42 United States Code section 1983, which affords a civil remedy for deprivations of United States legal or constitutional rights by persons acting under color of state law. (*Parratt* v.

*Taylor* (1981) 451 U.S. 527, 535 [68 L.Ed.2d 420, 428-429, 101 S.Ct. 1908].) Plaintiffs' fourth cause of action alleged that seven individual defendants (five police officers and two paramedics) deprived Jerry of his rights under the Fourth, Eighth, and Fourteenth Amendments. It specified the deprivation to consist of the defendants' imprisoning, assaulting, battery upon, using excessive force against, and refusing and failing to obtain or provide medical assistance to Jerry. The complaint alleged this conduct deprived him of his rights to be secure in his person from unreasonable and unlawful seizures, not to be deprived of life, liberty, or property without due process of law, to equal protection of the law, and not to be subjected to cruel and unusual punishment.

Plaintiffs argue the trial court declared a nonsuit without examining the evidence, exhibited no knowledge of section 1983 actions, and stated a belief that the section 1983 action was the same as the wrongful death action, and that plaintiffs therefore could not proceed on both. The gravamen of plaintiffs' argument on appeal, however, remains that the court did not find the evidence insufficient to establish the prima facie case necessary to place the case before the jury. Plaintiffs in essence claim that the use of excessive force by police caused Jerry's death and violated his Fourteenth Amendment rights to substantive due process. Egregious government conduct in the form of "excessive and brutal use of physical force" violates substantive due process. (*Smith* v. *City of Fontana* (9th Cir. 1987) 818 F.2d 1411, 1417.)

*Smith*, the only case plaintiffs cite to support this claim on appeal, relied upon the following cases in assessing "the reasonableness of the officers' actions given the circumstances:" police officers' unprovoked assault and battery, punching and kicking detainee after throwing him to the ground, without provocation and without arresting him (*Rutherford* v. *City of Berkeley* (9th Cir. 1986) 780 F.2d 1444, 1446); two prison guards' unjustified, unprovoked assault on prisoner, aggravated by their refusal to permit immediate medical treatment (*Shah* v. *County of Los Angeles* (9th Cir. 1986) 797 F.2d 743, 746); prison guard's attempt to plunge riot stick down prisoner's anus during strip search after a shakedown (*McRorie* v. *Shimoda* (9th Cir. 1986) 795 F.2d 780, 785); several prison guards severely beating, kicking, choking, and throwing prisoner against a wall when he shuffled his feet during a prison shakedown, and again beating him after he was taken to a holding unit (*Gaut* v. *Sunn* (9th Cir. 1986) 792 F.2d 874, 875); prisoner with emphysema denied request to be excused from breakfast because of emphysema attack and when attack worsened on the way to mess hall, prisoner complained of breathing difficulty to a warden, who struck prisoner in the solar plexus, which rendered him "totally handicapped" (*Meredith* v. *State of Arizona* (9th Cir. 1975) 523 F.2d 481, 482).

 These facts show that the treatment of Jerry in the case at bench does not rise to the level of conduct which shocks the conscience or which employs force which is "brutal" and "offensive to human dignity." (*Rochin v. California* (1952) 342 U.S. 165, 173-174 [96 L.Ed. 183, 190-191, 72 S.Ct. 205, 25 A.L.R.2d 1396].) As *Johnson* v. *Glick* (2d Cir. 1973) 481 F.2d 1028, 1033, points out, the constitutional protection is not nearly as extensive as that afforded by common law tort actions for battery or for assault. The jury in the case at bench, it must be remembered, found for the defendants and against the plaintiffs in the third cause of action for wrongful death from assault and battery. We see no evidence in this record that the police in this case applied force "maliciously and sadistically for the very purpose of causing harm." (*Ibid.*) Neither does the police conduct establish the "deliberate indifference to the rights of persons with whom the police come into contact" reflecting city policy that will support liability under 42 United States Code section 1983 as set forth recently by the United States Supreme Court. (*Canton* v. *Harris* (1989) 489 U.S. 378, 388 [103 L.Ed.2d 412, 426, 109 S.Ct. 1197].) We thus find no violation of Jerry's Fourteenth Amendment rights.

Plaintiffs also argue that the police defendants deprived Jerry of his Fourth Amendment right to be free from unlawful search and seizure. Plaintiffs claim the police officers' warrantless arrest was unreasonable, and was effected with unreasonable force.

 "Probable cause exists where 'the facts and circumstances within . . . [the officers'] knowledge and of which they had reasonably trustworthy information, [are] sufficient in themselves to warrant a man of reasonable caution in the belief that' an offense has been or is being committed" by the person to be arrested. (*Brinegar* v. *United States* (1949) 338 U.S. 160, 175-176 [93 L.Ed. 1879, 1890, 69 S.Ct. 1302], quoting *Carroll* v. *United States* (1925) 267 U.S. 132, 162 [69 L.Ed. 543, 555, 45 S.Ct. 280, 39 A.L.R. 790].)

 In the case at bench, police had responded to three radio calls that a breach of the peace was occurring on Coco Avenue. When they arrived it was evident that a fight had occurred. A man was lying face down in the street. Another, Jerry, was in a car trying to pull away from the curb. The police testified that Jerry appeared unable to move freely, with a rigid upper body and jaws, and spoke with difficulty, slurring his words. Jerry appeared intoxicated to Officer Saurman, who detected an alcoholic odor on his breath and also thought Jerry manifested symptoms of PCP use, with slurred speech, muscle rigidity, agitation when paramedics arrived, and shifts in his behavior from calmness to agitation. Both men stated they had been robbed, from which the officers concluded that either could have been a robbery suspect.

Given these facts, we conclude there was probable cause to arrest Jerry. ■■■■ When reasonable cause exists to believe the arrestee has committed a felony, the police may arrest whether or not in fact a felony has been committed. (Pen. Code, § 836, subd. 3; see *People* v. *Hill* (1974) 12 Cal.3d 731, 749 [117 Cal.Rptr. 393, 528 P.2d 1].)

■■■■ As to whether the arrest was effected with excessive force, the jury's finding that the police committed no assault and battery upon Jerry indicates that what force was used did not rise to the level of a deprivation of constitutional rights. The jury's verdict reveals that it focused on the lack of medical care as the factor that lead to Jerry's death, not the arrest itself, the handcuffing, or other treatment. Since there was a dispute in the evidence whether a baton or foot touched Jerry, that dispute must be resolved in favor of the jury's verdict, which found no assault and battery. The evidence indicates no excessive force used in relationship to the need presented, and no police motives of malice rising to the level where it shocks the conscience. The jury's verdict moreover implies no causative link between the amount of force used in the arrest and Jerry's medical complications. (*Shillingford* v. *Holmes* (5th Cir. 1981) 634 F.2d 263, 265.) It thus does not cross the constitutional line making a violation of Fourth Amendment rights actionable under section 1983.

Plaintiffs also argue that the nonsuit as to count 9 was not correct because plaintiffs (members of Jerry's immediate family) established an independent Fourteenth Amendment right to his society and companionship. *Kelson* v. *City of Springfield* (9th Cir. 1985) 767 F.2d 651, 654-655, states that parents have a constitutionally protected interest in the companionship of their children, cognizable under 42 United States Code section 1983. That right, however, arises under the Fourteenth Amendment's due process clause. As we have concluded, the arrest of Jerry did not violate his due process rights, and thus it cannot have violated those of his immediate family.

IV

NEW TRIAL; INSTRUCTIONAL ERROR

The trial court alternatively granted a new trial on the first and sixth causes of action on the grounds of insufficiency of the evidence to sustain the verdict (Code Civ. Proc., § 657, subd. 6) and excessive damages (Code Civ. Proc., § 657, subd. 5). Inasmuch as we have concluded, *ante*, there is substantial evidence to support the verdict against Maloney and the City of Los Angeles on the first cause of action but the remainder of the judgment

notwithstanding the verdict must be affirmed, the only question is the propriety of the grant of a new trial on the ground of excessive damages.

Plaintiffs contend, and defendants concede, the order granting the new trial on this ground is defective, in that it fails to state the trial court's reasons for granting a new trial on this ground. (Code Civ. Proc., § 657.) Accordingly, it must be reversed. (*Stevens v. Parke, Davis & Co.* (1973) 9 Cal.3d 51, 63 [107 Cal.Rptr. 45, 507 P.2d 653, 94 A.L.R.3d 1059].)

Plaintiffs also claim the trial court erroneously required plaintiffs to prove gross negligence. Inasmuch as we have concluded, in any event, Maloney's conduct rose to the level of gross negligence, we need not address this issue.

Plaintiffs assert the trial court erroneously instructed the jury that Jerry's arrest was permissible as a matter of law. This claim, however, rests on the assertion that the trial court made an erroneous ruling as to probable cause. Since we have found that substantial evidence supported the trial court's determination of probable cause (*Ramey v. Murphy* (1985) 165 Cal.App.3d 502, 510 [212 Cal.Rptr. 14]), this issue is also moot.

*On Cross-appeal*

V

Defendants urge, in the event the JNOV and new trial order are reversed, that the jury's verdict be reversed on the ground the damages awarded were excessive as a matter of law. On the wrongful death cause of action, the only one in question, the jury awarded $2 million damages.

The court's " 'power over excessive damages exists only when the facts are such that the excess appears as a matter of law, or is such as to suggest at first blush, passion, prejudice, or corruption on the part of the jury.' " (*DiRosario v. Havens* (1987) 196 Cal.App.3d 1224, 1240 [242 Cal.Rptr. 423].) However, "[t]he mere fact that the judgment is large does not validate an appellant's claim that the verdict is the result of passion or prejudice of the jury. Each case must be determined on its own facts. 'It is only in a case where the amount of the award of general damages is so disproportionate to the injuries suffered that the result reached may be said to shock the conscience, that an appellate court will step in and reverse a judgment because of greatly excessive . . . general damages.' " (*Id.* at p. 1241.) If the jury's verdict is supported by substantial evidence, it must be upheld. (*Id.* at p. 1240.)

We start with the presumption the record contains evidence to support the verdict (*People* v. *Dougherty* (1982) 138 Cal.App.3d 278, 282 [188 Cal.Rptr. 123]), and, indeed, there was evidence concerning Jerry's economic contributions to his family, his character, and his relationship and closeness with his parents, brother and sister, all proper considerations in determining a wrongful death award (*DiRosario* v. *Havens, supra*, 196 Cal.App.3d at p. 1239). Defendants do not demonstrate how this evidence is insufficient to support the award of damages. (See *Dougherty, supra*, at pp. 282-283.) Rather, they claim the damages were excessive as a matter of law, based on plaintiffs' argument to the jury and other wrongful death awards.

Defendants state: "Counsel for [plaintiffs] suggested the figure of $2,000,000 to the jury as appropriate compensation for the wrongful death cause of action. . . . He chose this figure in apparent comparison with the cost of a championship race horse, or a missle [*sic*]. . . . Such a comparison is an inherent appeal to the passion and prejudice of the jury which would naturally feel that the life of a human being was more important and valuable than the life of an animal or a weapon."

The record shows plaintiffs' counsel was attempting the difficult task of assigning a pecuniary value to a nonpecuniary loss. He stated: "Ladies and gentlemen of the jury, if a race horse was killed and was worth $6,000,000 if I came into court and said, you know, 'Mrs. Wright had a race horse worth $6,000,000,['] you say yes, $6,000,000 sounds fine for a race horse.

"We spend millions and millions of dollars on space ships, on weaponry, on all kinds of things, what is the value of a lost son? If this young man never gave a dime to his mother, if he never did anything for his mother, what is the value of a son? It's difficult in money damages, as you say, but you're being asked, and by your judgment and your verdict you say what the value of her son was. . . .

"The wrongful death, I'm going to put a figure down, you may disagree with the figure. I say that the loss of the comfort, the loss of those things, as his honor will tell you, are entitled to be compensated for the wrongful death of this young man, the love and affection.

"You may say it's worth more than that. I say $2,000,000. Why, you may say, $2,000,000? What is it, Secretariat is $20,000,000. Missiles are worth $20,000,000. The loss, the joy, the sorrow, the comfort, the affection, is it worth $2,000,000? You tell us. More, less, I think it's somewhere. I'm picking a figure, I don't know."

Plaintiffs' counsel made it clear it was up to the jury to determine the monetary value of Jerry's loss to his family, difficult though that may be. He picked a value, and the jury agreed with him, that was well below the values he stated for a racehorse and a missile. This does not suggest the jury was swayed by passion or prejudice into rendering a large verdict in order to place the value of a human being above that of a racehorse or a missile.

Defendants also suggest comparison with other wrongful death damage awards demonstrates the $2 million verdict was excessive. They cite *Fox* v. *Pacific Southwest Airlines* (1982) 133 Cal.App.3d 565 [184 Cal.Rptr. 87], in which $156,076 was awarded for the wrongful death of a 25-year-old man who had been an honors student, was in his senior year in medical school, was industrious, sensitive, generous, and affectionate and had a close relationship with his family. While the court did not need to resolve the defendant's claim of excessive damages, it did "suggest [the award did] not appear to be the product of passion, prejudice, or corruption." (At p. 572.) *Fox* does not, of course, establish the instant award is excessive as a matter of law.

In *DiRosario* v. *Havens, supra*, 196 Cal.App.3d 1224, cited by plaintiffs, the parents of a young girl killed in a traffic accident were awarded $2,084,300 for her wrongful death. Although the defendant claimed the damages were excessive, the court was unable to say, as a matter of law, the damages were so excessive as to warrant interference with the jury's verdict. (At pp. 1241-1242.) Neither are we able to say, as a matter of law, the award of a similar amount to Jerry's parents is so disproportionate to their loss as to shock the conscience and warrant interference with the jury's verdict. (*Ibid.*)[2]

The JNOV and the order granting a new trial are reversed as to plaintiffs' first cause of action for wrongful death, and the trial court is directed to enter a new and different judgment on that cause of action consistent with the views expressed herein. In all other respects, the judgments or orders appealed from are affirmed. Plaintiffs are to recover costs on appeal.

Ortega, J., concurred.

**HANSON, J.,** Concurring and Dissenting.—I concur in the majority's opinion that, since the jury found that Officer Saurman did not falsely imprison or batter Jerry Wright, Jr., no factual basis supported imposing

---

[2] In view of our conclusions regarding the wrongful death and negligent infliction of emotional distress verdicts, we need not address defendants' remaining contentions.

liability on Officer Saurman. The record shows that when the police arrived in the middle of the night, they faced a scene of utter confusion. The police observed the deceased, Jerry Wright, Jr., driving a vehicle over one Leroy Jones's hand. There was evidence that Wright and Jones had been involved in a fight, which each accused the other of having caused. Family members and neighbors who congregated at the scene joined the accusations. Clearly the police had a duty to sort out this confusion, to restore order, and to summon paramedics, and they satisfied their duty.

I respectfully dissent with regard to the majority opinion's finding of liability as to paramedic Maloney's conduct. The majority opinion's sole basis for reversal concerns Maloney's failure to examine Jerry Wright, Jr., for symptoms of shock. Plaintiff's theory of proximate causation is that had the paramedics treated the deceased victim for symptoms of shock, that treatment would have saved him from the true cause of death, which was not shock but sickle cell crisis. To base liability not on a failure to treat symptoms of the cause of death, but because a paramedic did not treat symptoms of another medical problem, is a quantum leap unsupported by legal authority that I am not prepared to take. In my view paramedic Maloney, as a matter of law, cannot be held liable for the unforeseeable consequences of failing to examine for or to treat symptoms of shock when a sickling crisis caused the death of Jerry Wright, Jr.

Furthermore, the controlling evidence as to the standard of care upon which the majority bases its finding of paramedical negligence is that outlined by the defense's expert witness, Nurse Jones. That testimony, however, made insufficent allowance for the totality of unique circumstances surrounding the actual event. Nurse Jones was not a percipient witness to what transpired at the scene.

The standard of care to which the paramedic should be held is that of "gross" negligence, defined as the lack of even scant care or an extreme departure from the ordinary standard of conduct; the amount of care reasonable under given circumstances is related to the apparent risk. Maloney was not trained to treat someone undergoing sickling crisis. Nothing triggered his awareness that Wright had sickle cell anemia. Although the paramedic's examination did not conform in all particulars with the paramedical standard of care, it nevertheless did constitute "gross" negligence. Keeping in mind that standard of care and remembering that Maloney had no knowledge of the concealed disease of sickle cell anemia that actually caused Jerry Wright, Jr.'s, death, I cannot say that the trial court erroneously granted the judgment notwithstanding the verdict (j.n.o.v.)

As counsel for both sides concede, no case law adjudicates wrongful death arising from sickle cell anemia under these facts. This would be the

first case imposing liability because a paramedic failed to test or treat for symptoms of something other than the actual cause of death. In my opinion, imposing liability under the totality of circumstances of this case stretches the nexus of liability close to absolute liability, and finds no basis in legislated or decisional law.

In sum, because the proof does not establish Maloney's "gross" negligence, I cannot say the trial court erroneously the granted the j.n.o.v. I would affirm the judgment of the trial court.

The petition of defendants and appellants for review by the Supreme Court was denied June 20, 1990.